## STATE OF CONNECTICUT *v.* MICHAEL FAUCI
### (SC 17402)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.

---

Argued September 21, 2006—officially released April 10, 2007

 

*Robert S. Bello*, with whom, on the brief, were *Lawrence M. Lapine, Thomas M. Cassone* and *Patrick D. McCabe*, for the appellant-appellee (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Maureen Ornousky*, senior assistant state's attorney, for the appellee-appellant (state).

*Opinion*

ZARELLA, J. The defendant, Michael Fauci, appeals, following our grant of certification, from the judgment of the Appellate Court affirming the judgments of conviction of three counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), and three counts of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4) and 53a-48. The defendant's convictions stemmed

from allegations that he had robbed three fast-food restaurants in Orange and Norwalk. On appeal to this court, the defendant claims (1) that the Appellate Court improperly determined that he was not denied a fair trial as a result of four instances of prosecutorial impropriety, and (2) that the senior assistant state's attorney (state's attorney) engaged in two other instances of prosecutorial impropriety.[1] On cross appeal, the state claims that the Appellate Court improperly concluded that four statements made by the state's attorney at trial constituted prosecutorial impropriety.[2] We con-

[1] The defendant raises one additional claim of prosecutorial impropriety in his brief that he did not raise in the Appellate Court. We ordinarily decline to consider claims that are not raised properly before the Appellate Court or in the petition for certification to appeal to this court. See State v. Gilbert, 229 Conn. 228, 246, 640 A.2d 61 (1994). In a certified appeal, "the focus of our review is not [on] the actions of the trial court . . . but [on] the actions of the Appellate Court. We do not hear the appeal de novo. The only questions that we need consider are those squarely raised by the petition for certification . . . ." State v. Torrence, 196 Conn. 430, 433, 493 A.2d 865 (1985). Thus, because this claim was not raised in the Appellate Court, the defendant's petition for certification to appeal, or the state's petition for certification to cross appeal, and because the Appellate Court did not address this claim in its opinion, we decline to address it.

[2] The use of the term "prosecutorial impropriety," when reviewing allegedly improper statements by a prosecutor at trial, is more appropriate than the traditional term of "prosecutorial misconduct" in light of our analysis under State v. Williams, 204 Conn. 523, 529 A.2d 653 (1987). Prosecutors make countless discretionary decisions under the stress and pressure of trial. A judgment call that we later determine on appeal to have been made improperly should not be called "misconduct" simply because it was made by a prosecutor. To label what is merely improper as misconduct is a harsh result that brands a prosecutor with a mark of malfeasance when his or her actions may be a harmless and honest mistake. Though our analysis does not change, this new terminology better reflects the actions of a prosecutor under Williams because the first part of our analysis looks at whether the actions of the prosecutor are improper rather than the effects of those actions on the fairness of the trial. Id., 540. If these actions do, in fact, so infect the trial with unfairness as to make the resulting conviction a denial of due process, they rise to the level of harmful impropriety. Id. Furthermore, our use of the term "prosecutorial impropriety" to refer to what is traditionally called "misconduct" is not unprecedented. E.g., State v. Ancona, 270 Conn. 568, 579, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005); State v. James G., 268 Conn. 382, 420, 844

clude that the state's attorney committed one instance

A.2d 810 (2004); *State* v. *Peeler*, 267 Conn. 611, 640, 841 A.2d 181 (2004); *State* v. *Ceballos*, 266 Conn. 364, 390, 832 A.2d 14 (2003); *State* v. *Reynolds*, 264 Conn. 1, 191, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); *State* v. *Floyd*, 253 Conn. 700, 749, 756 A.2d 799 (2000); *State* v. *Copas*, 252 Conn. 318, 337, 746 A.2d 761 (2000); *State* v. *Provost*, 251 Conn. 252, 263, 741 A.2d 295 (1999), cert. denied, 531 U.S. 822, 121 S. Ct. 65, 148 L. Ed. 2d 30 (2000); *State* v. *Satchwell*, 244 Conn. 547, 564, 710 A.2d 1348 (1998). Many other jurisdictions also have used terms other than "misconduct" to describe these types of actions by a prosecutor. E.g., *Ferguson* v. *State*, 814 So. 2d 925, 946 (Ala. Crim. App. 2000) (using term "prosecutorial error"); *State* v. *Hughes*, 193 Ariz. 72, 79–80, 969 P.2d 1184 (1998) (using terms "prosecutorial misconduct" and "prosecutorial impropriety" interchangeably); *People* v. *Hill*, 17 Cal. 4th 800, 823 n.1, 952 P.2d 673, 72 Cal. Rptr. 2d 656 (1998) (using term "prosecutorial error" because "the term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind"); *Simpson* v. *United States*, 877 A.2d 1045, 1048 (D.C. 2005) (holding that prosecutor's improper introduction of fact not in evidence was "prosecutorial error"); *Garcia* v. *State*, 622 So. 2d 1325, 1331–32 (Fla. 1993) (using terms "prosecutorial misconduct" and "prosecutorial impropriety" interchangeably); *People* v. *Nevitt*, 135 Ill. 2d 423, 448–53, 553 N.E.2d 368 (1990) (using term "prosecutorial error"); *Stephenson* v. *State*, 742 N.E.2d 463, 482–85 (Ind. 2001) (using terms "prosecutorial impropriety" and "prosecutorial misconduct" interchangeably), cert. denied, 534 U.S. 1105, 122 S. Ct. 905, 151 L. Ed. 2d 874 (2002); *State* v. *White*, 279 Kan. 326, 342–43, 109 P.3d 1199 (2005) (holding that prosecutor's misstatements of law during closing argument was "prosecutorial error"); *Epperson* v. *Commonwealth*, 197 S.W.3d 46, 61 (Ky. 2006) (holding that alleged improper statements by prosecutor did not constitute "prosecutorial error"), cert. denied, 549 U.S. 1290, 127 S. Ct. 1840, 167 L. Ed. 2d 337 (2007); *State* v. *Hampton*, 750 So. 2d 867, 877–78 (La.) (using term "prosecutorial error" to describe prosecutor's misstatement of law to jury), cert. denied, 528 U.S. 1007, 120 S. Ct. 504, 145 L. Ed. 2d 390 (1999); *State* v. *Lemar*, 483 A.2d 702, 704 (Me. 1984) (using term "prosecutorial error"); *Giddins* v. *State*, 163 Md. App. 322, 337, 878 A.2d 687 (2005) (using term "prosecutorial error"), aff'd, 393 Md. 1, 899 A.2d 139 (2006); *Commonwealth* v. *Coren*, 437 Mass. 723, 730–31, 774 N.E.2d 623 (2002) (referring to improper statements during prosecutor's closing argument as "prosecutorial error"); *State* v. *Pendleton*, 706 N.W.2d 500, 509 (Minn. 2005) (holding that prosecutor's improper reference to out-of-court statement during cross-examination was "[p]rosecutorial error"); *State* v. *Crews*, 923 S.W.2d 477, 482 (Mo. App. 1996) (holding that prosecutor's remark that defense counsel acted like "magician" in distracting jury from facts did not rise to level of "prosecutorial impropriety" [internal quotation marks omitted]); *Rowland* v. *State*, 118 Nev. 31, 39, 39 P.3d 114 (2002) (prosecutor committed "prosecutorial error" when he vouched for witness);

of prosecutorial impropriety and that it did not deprive the defendant of a fair trial. Accordingly, we affirm the judgment of the Appellate Court.

The following facts and procedural history are set forth in the opinion of the Appellate Court. "On the evening of May 28, 2001, the defendant and his friend, Ricky Saymon, robbed a McDonald's restaurant in Orange. The defendant's former girlfriend, Laurie Lasko, drove the getaway car. Lasko parked her red Buick Skylark in an abandoned parking lot near the [restaurant], and she waited in the car while the defendant and Saymon, wearing black clothing, masks and gloves and carrying a duffle bag, went to rob the restaurant. The defendant carried a gun, and Saymon carried a hammer. At approximately 11:45 p.m., the defendant and Saymon gained access to the closed restaurant by

*State* v. *Little*, 138 N.H. 657, 662–63, 645 A.2d 665 (1994) (using term "prosecutorial error"); *State* v. *Bey*, 129 N.J. 557, 621, 610 A.2d 814 (1992) (prosecutor committed "prosecutorial error" when he improperly downplayed significance of age as mitigating factor in death penalty case); *State* v. *Mitchell*, 353 N.C. 309, 326, 543 S.E.2d 830 (referring to improper statements by prosecutor as "prosecutorial error"), cert. denied, 534 U.S. 1000, 122 S. Ct. 475, 151 L. Ed. 2d 389 (2001); *State* v. *Williams*, 99 Ohio St. 3d 493, 514–15, 794 N.E.2d 27 (2003) (using term "prosecutorial error" to describe prosecutor's injection of most emotional aspects of crime into closing arguments); *Commonwealth* v. *Rizzuto*, 566 Pa. 40, 71, 777 A.2d 1069 (2001) (using terms "prosecutorial error" and prosecutorial "misconduct" interchangeably); *State* v. *Beltre*, 764 A.2d 190, 191 (R.I. 2000) (using terms "prosecutorial error" and "prosecutorial misconduct" interchangeably); *State* v. *Big Head*, 363 N.W.2d 556, 563 (S.D. 1985) (using term "prosecutorial error" to describe prosecutor's misstatement while examining witness); *Stahl* v. *State*, 749 S.W.2d 826, 830 (Tex. Crim. App. 1988) (using terms "prosecutorial misconduct" and "prosecutorial error" interchangeably); *State* v. *Archuleta*, 850 P.2d 1232, 1242 (Utah 1993) (referring to prosecutor's inadvertent but improper presentation of testimony as "prosecutorial error"); *In re Personal Restraint of Pirtle*, 136 Wash. 2d 467, 481–82, 965 P.2d 593 (1998) (using terms "prosecutorial misconduct" and "prosecutorial error" interchangeably); *State* v. *Jenich*, 94 Wis. 2d 74, 92–93, 288 N.W.2d 114 (referring to prosecutor's misstatement, made in good faith, as "prosecutorial error"), modified on other grounds, 94 Wis. 2d 97a, 292 N.W.2d 348 (1980); *Dice* v. *State*, 825 P.2d 379, 384–85 (Wyo. 1992) (using term prosecutorial "error" to describe improper comments by prosecutor).

throwing a rock through a glass door. The restaurant manager, Inez Padilla, and one employee, Marlene Flores, were inside the restaurant. The defendant pointed the gun at Padilla [as she prepared to make the nightly deposit] and ordered her to give him the money that she was holding in her hand . . . . The defendant took the money and then locked . . . Padilla and Flores in the stockroom. Soon, he demanded that Padilla give him all of her keys so that he could unlock the drop safe under the front counter. Padilla gave him the keys from underneath the stockroom door . . . but told him that she did not have the key to the drop safe. Padilla and Flores listened as they heard the defendant and Saymon ransack the restaurant for fifteen or twenty minutes. Once things quieted down, they pushed out [the] ceiling tiles in the stockroom, crawled through the opening and escaped. They found that the restaurant had been ransacked, the register drawers had been pried open and the drop safe had been stolen. They telephoned the police.

"On August 10, 2001, the defendant suggested to Samuel Parisi that they rob a Taco Bell restaurant in Norwalk to obtain money to post bail for Saymon.[3] The defendant's younger brother, Adam Fauci, drove the getaway car and took the defendant and Parisi to the back of the [restaurant] parking lot. After dropping them off, Adam Fauci drove across the street to a gasoline station to wait. Both Parisi and the defendant, wearing black clothing, masks, gloves and hats and carrying firearms, waited near a dumpster for the customers to leave the [restaurant]. The defendant carried a loaded firearm, and Parisi carried two unloaded firearms. Parisi picked up a rock and, once the customers were gone, threw it through the glass door, and he and the defendant entered the [restaurant] with their weapons drawn.

---

[3] "Saymon had been arrested and was being held on unrelated charges." *State* v. *Fauci*, 87 Conn. App. 150, 153 n.1, 865 A.2d 1191 (2005).

The defendant pointed his firearm at the manager, William Morales, while Parisi kept his weapons pointed at the four employees. The defendant asked Morales where the money was kept, and Morales said that it was in the office. The defendant then walked Morales to the office to get the deposit bag. The defendant next ordered Morales to open the safe at the front counter. Morales attempted to open the safe but explained that it was deadlocked and could not be opened until morning. The defendant did not accept this and ordered Morales to try again. When the defendant ordered Morales to try a third time, Morales explained that an alarm would sound and the police would come if he tried again. The defendant then ordered the cashier at the drive through window to give him the money from that cash register, which the cashier did, and the defendant and Parisi left . . . .

"On September 5, 2001, the defendant borrowed Lasko's car, and he, Parisi and Saymon, who was then out of jail, planned to rob a McDonald's restaurant in Norwalk. The men gathered their gloves, masks, hats and hooded sweatshirts for the robbery. They also took their firearms. Although they had planned to gain access to the [restaurant] by throwing a rock through a glass door, the door was unlocked, giving them easy access. Saymon grabbed the manager, Daisy Ashman, and ordered her to open the safe. The defendant stood over another employee, Blanca Vasquez, ensuring that she did not move. After Ashman opened the safe, Parisi emptied it. Saymon then asked Ashman where additional money was located, and Ashman stated that she did not know. The men then grabbed Vasquez' purse, which contained $500, and they ran out of the [restaurant].

"The defendant was charged with and convicted of three counts of robbery in the first degree and three counts of conspiracy to commit robbery in the first

degree."[4] *State* v. *Fauci,* 87 Conn. App. 150, 152–55, 865 A.2d 1191 (2005). The defendant appealed to the Appellate Court from the judgments of conviction, claiming, inter alia, that, because the state's attorney committed certain prosecutorial improprieties, he was denied a fair trial. The Appellate Court determined that there had been four instances of prosecutorial impropriety but affirmed the judgments of conviction after determining that he nevertheless received a fair trial. We granted the defendant's petition for certification to appeal and the state's petition for certification to cross appeal, limited to the following issues: "Did the Appellate Court properly conclude that: (1) the state engaged in prosecutorial [impropriety]; and (2) the defendant was not deprived of a fair trial as a result?" *State* v. *Fauci,* 273 Conn. 921, 922, 871 A.2d 1029 (2005).

I.

We first address the defendant's claims. The defendant claims that the Appellate Court properly determined that the state's attorney had committed four instances of prosecutorial impropriety at trial but incorrectly concluded that two additional statements by the state's attorney were not improper. The defendant also claims that the Appellate Court incorrectly concluded that none of the instances of alleged prosecutorial impropriety deprived him of a fair trial. Specifically, the defendant claims that he was denied a fair trial because the state's attorney made statements that fall into three prohibited categories: (1) the expression of her personal opinion regarding the credibility of witnesses or the defendant's guilt; (2) the suggestion that, in order to find the defendant not guilty, the state's witnesses must be lying; and (3) the introduction of

---

[4] The trial court sentenced the defendant to fifteen years imprisonment and five years of special parole for his role in the robberies, and imposed a concurrent sentence of five years imprisonment for the conspiracy charges.

facts not in evidence and improper argument urging inferences based on those facts. We agree with the Appellate Court that the defendant was not deprived of a fair trial but conclude that only one instance of prosecutorial impropriety occurred.

We begin our analysis by setting forth the applicable law regarding claims of prosecutorial impropriety. In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. E.g., *State* v. *Stevenson*, 269 Conn. 563, 572, 849 A.2d 626 (2004). The two steps are separate and distinct. Id. We first examine whether prosecutorial impropriety occurred. Id. Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. Id. In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. See id.

"[T]he touchstone of due process analysis in cases of alleged [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions] in the context of the entire trial. . . .

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as

much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Internal quotation marks omitted.) *State* v. *Ritrovato*, 280 Conn. 36, 61–62, 905 A.2d 1079 (2006).

At trial, the defendant did not object to all of the instances of prosecutorial impropriety that he now raises on appeal. Once prosecutorial impropriety has been alleged, however, it is unnecessary for a defendant to seek to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[5] and it is unnecessary for an appellate court to review the defendant's claim under *Golding*. *State* v. *Stevenson*, supra, 269 Conn. 572–73. "The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). As [the court] stated in that case: In determining whether prosecutorial [impropriety] was

---

[5] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, supra, 213 Conn. 239–40.

so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"Regardless of whether the defendant has objected to an incident of [impropriety], a reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the [impropriety] is viewed in light of the entire trial. The application of the *Williams* factors, therefore, is identical to the third and fourth prongs of *Golding*, namely, whether the constitutional violation exists, and whether it was harmful. . . . Requiring the application of both *Williams* and *Golding*, therefore, would lead . . . to confusion and duplication of effort. Furthermore, the application of the *Golding* test to unchallenged incidents of [impropriety] tends to encourage analysis of each incident in isolation from one another. Because the inquiry must involve the entire trial, all incidents of [impropriety] must be viewed in relation to one another and within the context of the entire trial. The object of the inquiry before a reviewing court in claims involving prosecutorial [impropriety], therefore, is always and only the fairness of the entire trial, and not the specific incidents of [impropriety] themselves. Application of the *Williams* factors provides for such an analysis, and the specific *Golding* test, therefore, is superfluous." (Citations omitted; internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 573–74. In accordance with these principles, we review

the defendant's claim to determine, first, whether the state's attorney committed any impropriety and, second, whether the impropriety or improprieties deprived the defendant of a fair trial.

As we previously stated, the specific instances of impropriety that the defendant raises on appeal fall into three prohibited categories: (1) the expression of the state's attorney's personal opinion regarding the credibility of witnesses or the defendant's guilt; (2) the suggestion that, in order to find the defendant not guilty, the state's witnesses must be lying; and (3) the introduction of facts not in evidence and improper argument urging inferences based on those facts. We address each of these categories in turn.

A

We first examine whether the state's attorney committed an impropriety through an improper expression of her personal opinion regarding the credibility of witnesses or the defendant's guilt. We consistently have held that it is improper for a prosecuting attorney to express his or her own opinion, directly or indirectly, as to the credibility of witnesses. E.g., *State* v. *Bermudez*, 274 Conn. 581, 598, 876 A.2d 1162 (2005), after remand, 95 Conn. App. 577, 897 A.2d 661 (2006). "Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 462, 832

A.2d 626 (2003); see also *State* v. *Reynolds*, 264 Conn. 1, 163, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

We have held, however, that "[i]t is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Citation omitted; internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 465.

The defendant claims that, during the state's attorney's rebuttal argument, she improperly introduced her personal opinion regarding the credibility of a witness. The state's attorney stated: "I think that the most important thing for you to look at when you're trying to evaluate people's statements is that you should look at whether or not they had—when they made these statements, were they implicating themselves? Both [Parisi] and [Lasko] implicated themselves [in the] wrongdoing. And maybe because I've been in this business for a long time, it's not hard for me to see that people tend to lie to get themselves out of trouble, not to get themselves into trouble. And maybe because I've been in this business for a long time, I feel that there seems to be something inherently reliable about statements that people make that implicate themselves [in] wrongdoing, but I don't think it's because I've been here so long. I think it's common sense."

We agree with the Appellate Court that the state's attorney's remarks in this instance were not based on personal opinion and were not an improper attempt to bolster the credibility of these witnesses. We have held

that "[i]t is not improper for a prosecutor to remark on the motives that a witness may have to lie." *State* v. *Thompson,* supra, 266 Conn. 466. In *State* v. *Stevenson,* supra, 269 Conn. 584–85, we determined that it was not improper for a prosecutor to suggest in her rebuttal argument that the police and the victims had no reason to lie but that the defendant and his friends and family did have a motive to lie. We concluded that this was proper because it was based on the "ascertainable motives of the witnesses" rather than the prosecutor's personal opinion. Id. We also noted that the prosecutor's "remarks underscored an inference that the jury could have drawn entirely on its own, based on the evidence presented." Id., 585.

In the present case, the remarks made by the state's attorney in her rebuttal merely underscored the commonsense inference that individuals typically do not lie when doing so would subject them to criminal sanction. It is clear from her closing argument that the state's attorney simply was asking the jurors to exercise their common sense and to conclude that Lasko and Parisi would not lie against their penal interest. In fact, although the state's attorney cited her experience as a prosecutor, she explicitly discounted that experience by stating, "I don't think it's because I've been here so long. I think it's common sense."

The state's attorney reinforced this point by comparing this situation to the jurors' everyday lives. She proceeded to argue immediately after the statement in question: "If you have a family member or you have a child or you have anybody in your life that may not always be totally truthful with you, you know that they lie to get out of trouble. They don't lie to get into trouble. When they're telling you something bad that they did, it's truthful usually because they're implicating themselves. They're talking against their own penal interest. That's what both of these people did." When the state's

attorney's remarks are viewed in context, it is clear that she was not vouching for the witnesses' credibility or giving her opinion as to the veracity or reliability of their statements. Furthermore, the state's attorney's remarks do not suggest that they were based on her knowledge of facts not in evidence. She merely was underscoring the commonsense inference that people do not tend to lie when they make statements against their penal interest.

The defendant cites the repeated use of the pronoun "I" as evidence that the state's attorney was expressing her personal opinion during her closing argument. Although logic dictates that the use of "I" increases the likelihood that a statement is an expression of one's personal opinion, it is not necessarily so. The use of "I" is an integral part of our lexicon that is not easily eliminated from speech. Therefore, we must look at the statement, including the use of the pronoun "I," as a whole, in determining whether it was an expression of the state's attorney's personal opinion regarding the credibility of witnesses.

In the present case, the state's attorney's use of the pronoun "I" merely was the expression of her opinion regarding a commonsense method for evaluating the credibility of the witnesses and not an opinion as to the actual credibility of those witnesses. In other words, the state's attorney merely was pointing out a generally accepted, commonsense inference that can be drawn from a witness' testimony against his or her penal interest. The remarks of the state's attorney, therefore, were not improper.

## B

The defendant next claims that the state's attorney committed prosecutorial impropriety when she implied, in her rebuttal argument, that, in order to find the defendant not guilty, the jury had to conclude that the state's

witnesses must be lying. The Appellate Court concluded that the state's attorney's statement in this instance was not improper. We agree.

The defendant claims that the following statement was improper: "And this red herring that's been thrown in that there's some other person out there that could possibly have been—being protected by . . . Parisi falls flat on its face. Because you know why? Because that means . . . Lasko would have to be trying to protect someone, too. And just by chance, when they were interviewed separately by the police, they both implicated [the defendant] falsely. They just picked him out and falsely implicated him. And so, she must be trying to protect somebody. And [Parisi] must be trying to protect somebody. And, by some fortuitous or unfortunate circumstance, they both picked the same person to insert in there." The defendant claims that this argument essentially distorted the state's burden of proving the defendant's guilt beyond a reasonable doubt. We disagree.

"[C]ourts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied. . . . The reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof." (Internal quotation marks omitted.) *State* v. *Thompson,* supra, 266 Conn. 470. Nevertheless, in a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and thus to argue, that one of the two sides is lying. See id., 465–66. For instance, as we previously noted in *Stevenson,* it was not improper for a prosecutor to suggest that the police and the victims had no reason to lie but that the defendant and his friends and family did have a reason to do so. *State* v. *Stevenson,* supra, 269 Conn. 584–85. We reasoned that this was proper because it was based on the "ascertainable motives of

the witnesses" rather than the prosecutor's personal opinion. Id. We also noted that the prosecutor's "remarks underscored an inference that the jury could have drawn entirely on its own, based on the evidence presented." Id., 585.

In the present case, the state's attorney did not state or even suggest that the jury had to conclude that Parisi and Lasko were lying in order to find the defendant not guilty. The state's attorney merely was attempting to rebut the argument of defense counsel, raised in his summation to the jury, that Parisi had given testimony that falsely implicated the defendant in order to protect the true culprit. In a case that boiled down to which of two conflicting stories was true, the state's attorney simply presented the jury with the reasonable inference that it is unlikely that two witnesses, whose statements are corroborated by each other's statements and are given independently, were covering for the same individual. In other words, the state's attorney presented the circumstances of the witnesses' statements and asked the jury to weigh the evidence and use its common sense to determine whether both witnesses were lying to protect someone. The commonsense inference that corroborated statements tend to be true necessarily suggests that defense counsel's theory regarding Parisi's testimony was unlikely. As we previously have held, it is neither inappropriate nor improper for a prosecutor to present alternatives to the jury in an effort to rebut the defendant's implication that the state's witnesses had reasons for lying. See, e.g., id., 584–85; *State* v. *Thompson*, supra, 266 Conn. 466. In the present case, the state's attorney merely was responding to defense counsel's implication that Lasko and Parisi were covering for another individual. Consequently, the state's attorney was asking the jury to draw a commonsense inference when weighing the testimony of the state's

witnesses against defense counsel's statements. This was not improper.

## II

We next address the claims that the state raises in its cross appeal. The state claims that the Appellate Court improperly found that the state's attorney committed four instances of impropriety at trial. The state agrees with the Appellate Court, however, that none of the alleged instances of impropriety was harmful. Specifically, the state claims that the Appellate Court improperly concluded that the state's attorney (1) vouched for the credibility of the state's witnesses, and (2) improperly introduced facts not in evidence. We agree with the state that the state's attorney did not improperly vouch for the credibility of the state's witnesses but agree with the Appellate Court that she did improperly introduce facts not in evidence.

## A

The state claims that the Appellate Court incorrectly concluded that the state's attorney improperly vouched for the credibility of witnesses on three occasions. We address each alleged instance in turn.

## 1

The state first claims that the Appellate Court incorrectly concluded that the state's attorney improperly vouched for Parisi when she characterized his testimony that he did not have a black cousin as "the truth."[6] (Internal quotation marks omitted.) The state claims

---

[6] Although we do not wish to place a prosecutor in a "rhetorical straightjacket"; *State* v. *Thompson*, supra, 226 Conn. 465; the use of the word "truth" to describe a person or statement may invite an allegation of prosecutorial impropriety when none exists. Without proscribing the use of the word, or even suggesting it is improper, we note that certain words tend to give rise to claims of prosecutorial impropriety, and, therefore, a prosecutor's more judicious selection of words may avoid such allegations altogether.

that the state's attorney merely was attempting to explain Parisi's alleged "evasive[ness]" during his testimony. We agree.

During his closing argument, defense counsel commented on Parisi's testimony[7] by rhetorically asking, "I wonder why Mr. Parisi was evasive? Did he have something to hide? Was the black individual his cousin? Was he involved? Was he protecting his cousin? . . . Why was he so evasive? He knew exactly what I was asking." Defense counsel continued by saying again that this black cousin may have been involved in at least one of the crimes and that Parisi was being evasive when questioned about him. Defense counsel's state-

---

[7] The following colloquy between defense counsel and Parisi occurred at trial. This exchange also is the basis for defense counsel's closing statement regarding the evasiveness of Parisi, to which the state's attorney responded with the statement that is alleged to be improper:

"[Defense Counsel]: Do you have a cousin by the name of Randy Roy?

"[Parisi]: No.

"[Defense Counsel]: Do you have a black cousin?

"[Parisi]: No.

"[Defense Counsel]: Oh, you don't. So, no one else was in the house on the night of the Orange incident except the people that you've listed?

"[Parisi]: Not that I recall.

"[Defense Counsel]: How about Jen Roy?

"[Parisi]: I have a cousin Jen Roy.

"[Defense Counsel]: All right. And does she have a boyfriend or a husband?

"[Parisi]: Yeah. She has a boyfriend.

"[Defense Counsel]: Do you know his name?

"[Parisi]: Randy.

"[Defense Counsel]: Randy. So, that's Randy Roy.

"[Parisi]: No.

"[Defense Counsel]: Oh, that's a different—I'm sorry. A different last name?

"[Parisi]: Yeah.

"[Defense Counsel]: Was he present?

"[Parisi]: Not that I remember.

"[Defense Counsel]: Is he a black individual?

"[Parisi]: Yes, he is.

"[Defense Counsel]: And you don't remember him there the night that the alleged incident in Orange occurred?

"[Parisi]: Not that I remember."

ment, however, belies the fact that Parisi testified that he did not have a black cousin but that his cousin had a black boyfriend. Furthermore, other than the statements of defense counsel, the record is devoid of any evidence to suggest that Parisi had a black cousin.

In response to these comments, the state's attorney made the following statement. "This black person that [defense counsel] referred to [during closing argument] as . . . Parisi's cousin, well, if you recall [Parisi's] testimony, that's simply not true. . . . Parisi does not have a black cousin. He has a cousin who has a black boyfriend who was at [Parisi's] apartment at one point. That's improper. That is not in the evidence. And there's nothing at all remotely linking any black man to this robbery. And for you to speculate that it must be some other guy that the defense claims was around during this time is just not in the evidence, and you're not to speculate on that. And it's a mischaracterization of what the testimony was. The reason . . . Parisi was confused when he was being asked that question is because [defense] counsel kept referring to him as his cousin, and he wasn't his cousin. And he didn't know what he was talking about. And that's the truth. That's the testimony. If you remember it, that's how it happened. And it's your recollection of the testimony, not the defense counsel's or mine, that counts." The defendant claimed that, by virtue of these remarks, the state's attorney improperly vouched for Parisi's credibility.

"[Although a] prosecutor is permitted to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses." (Internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 454, 797 A.2d 1088 (2002). In this instance, the state's attorney did not vouch for the credibility of Parisi. The purpose of the statement was to rebut the inferences that defense

counsel was asking the jury to draw on the basis of facts that were not in evidence. The inference that defense counsel sought to have the jury draw was that Parisi was evasive because he wanted to protect his black cousin. The state's attorney rebutted this inference by noting that Parisi was confused, not evasive, because he had no black cousin, and that there was no evidence to suggest that he did have a black cousin. The thrust of defense counsel's argument was that Parisi's evasiveness was indicative of mendacity. The thrust of the state's attorney's argument was that Parisi was confused because defense counsel had mischaracterized Parisi's answers while questioning Parisi and then had repeated those mischaracterizations in his closing argument. It is clear from a review of the state's attorney's remarks in context that the statement, "[t]hat's the truth," referred to what the actual testimony was, not to whether it should be believed. The state's attorney underscored this point by stating immediately thereafter, "[t]hat's the testimony. If you remember it, that's how it happened. And it's your recollection of the testimony, not the defense counsel's or mine, that counts." The state's attorney, therefore, did not vouch for Parisi's credibility, and her remarks were not improper.

2

The state next claims that the Appellate Court incorrectly concluded that the state's attorney improperly attempted to bolster the credibility of Lasko when she stated in her rebuttal argument that Lasko "was the driver in this incident and the least culpable person that had knowledge about the Orange robbery of the people [who] were involved with it. It makes absolute sense that she would be the person and, in addition, because she gave a truthful statement to the police in the first place implicating herself, that she'd be the person that the state would be interested in obtaining her testimony." The defendant argues that this state-

ment left the jury with the impression that "[t]he police and state trust [Lasko], [and that] you should as well." We disagree.

When reviewing a claim of prosecutorial impropriety, we do not scrutinize each individual comment in a vacuum but, rather, "review the comments complained of in the context of the entire trial." *State* v. *Robinson*, 227 Conn. 711, 746, 631 A.2d 288 (1993). When the state's attorney's comment that Lasko's statement to the police was "truthful" is read in a vacuum, we agree that it may have been improper.[8] We must read the questionable comments in context, however. See id. The state's attorney did say that Lasko's statement was "truthful" but explained that the state was interested in obtaining her testimony because "she gave a truthful statement to the police in the first place *implicating herself* . . . ." (Emphasis added.) This suggests that Lasko's testimony was truthful because the statement implicated her criminally.

The state's attorney immediately reinforced this inference by describing the punishment that Lasko faced in making her statement. "I would just like you to think— and when you're back there in that jury room—about three years in jail for someone who's never been arrested before and who's never spoken to the police before and has never been locked up before. And it may seem like a short period of time considering all the things that she was charged with, which, as you know, is a result of her confessions, her arrests were a result of her confessions. Three years. You sit there for a half hour and think about being incarcerated for a half hour. Three years to someone who's never spent time in jail is punishment."

As we previously have noted, "[w]e must give the jury the credit of being able to differentiate between

[8] See footnote 6 of this opinion.

argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 465–66. In other words, a prosecutor's remarks are not improper when they underscore an inference, on the basis of the evidence presented at trial, that the jury could have drawn on its own. See *State* v. *Stevenson*, supra, 269 Conn. 585.

In the present case, the state's attorney's use of the term "truthful," taken in context, did not suggest to the jury that she had secret knowledge that Lasko's testimony was reliable but merely suggested that, because Lasko faced serious criminal sanction in making her statement to the police, she likely was telling the truth. In other words, the state's attorney was not, as the defendant claims, suggesting to the jury that "[t]he police and state trust [Lasko], you should as well." Rather, the state's attorney was saying that the police and state trusted Lasko because the statement she gave to the police subjected her to three years imprisonment. This statement was not improper.

3

The state next claims that the Appellate Court incorrectly concluded that the state's attorney vouched for both Parisi and Lasko when she opined, during her rebuttal argument, that their statements were "inherently reliable information because [they have] been corroborated by other evidence." The state argues that the state's attorney was not improperly expressing her personal opinion but merely asking the jury to draw a reasonable conclusion from the testimony presented at trial. We agree with the state.

In her closing remarks, the state's attorney stated: "Their statements are—the coconspirators' statements

are *inherently reliable information because [they have] been corroborated by other evidence.* They know that— we know that . . . ." (Emphasis added.) Defense counsel objected to this statement:

"[Defense Counsel]: Your Honor, I thought the law is that you can't vouch for a witness. She said they're inherently reliable. . . .

"[State's Attorney]: It's inherently reliable when someone implicates themselves. . . .

[Whereupon, the state's attorney continues her closing remarks.]

"[State's Attorney]: As the [court] indicated, you're the triers of the facts. You're the ones that got to hear all these people. . . . There was no reason for these two individuals that testified to implicate the defendant falsely. There was no showing at all through their cross-examination of why they would have both implicated him falsely. And the common thread in all these three robberies is the defendant."

Similar to the preceding instance of alleged prosecutorial impropriety, where the state's attorney commented that the state was interested in a witness' testimony because the witness' statement to the police was "truthful," the state's attorney's comment that Parisi's and Lasko's statements were "inherently reliable" because they were corroborated by other evidence was not improper. As we stated previously, it is improper for a prosecuting attorney to express his or her "own opinion, directly or indirectly, as to the credibility of witnesses." *State* v. *Bermudez*, supra, 274 Conn. 598. We also stated, however, that "[i]t is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 465.

In the present case, the state's attorney presented the jury with a commonly used technique to judge the witnesses' credibility. The notion that testimony that is "corroborated by other evidence" is "inherently reliable" is a reasonable inference to draw when weighing the competing testimony of witnesses at trial. As we previously stated, in a case that turns on which competing story a jury believes, it is reasonable for a prosecutor to ask the jury to infer that one of the two sides is lying. See *State* v. *Thompson*, supra, 266 Conn. 465–66. The distinguishing characteristic of impropriety in this circumstance is whether the prosecutor asks the jury to believe the testimony of the state's witnesses because the state thinks it is true, on the one hand, or whether the prosecutor asks the jury to believe it because logic reasonably thus dictates. See id. In this instance, the state's attorney did not vouch for the credibility of the state's witnesses, and her comments were not improper.

B

The state next claims that the Appellate Court improperly concluded that the state's attorney introduced facts not in evidence regarding a witness during her rebuttal argument. Specifically, the Appellate Court concluded that the state improperly had introduced facts not in evidence to impeach Lazarus Dimitriadis, one of the defendant's alibi witnesses. We disagree with the state and agree with the Appellate Court.

During the trial, Dimitriadis testified that he had driven to New York with his niece and the defendant on September 5, 2001, the date of the last robbery. Dimitriadis then refused to disclose the name of a woman whom he met in New York, stating that "[s]he wants to stay out of it . . . ." During her rebuttal argument, the state's attorney argued that when Dimitriadis spoke to the state's investigator on March 13, 2003, "he also admitted . . . [that] four of them . . . left from

Norwalk and went down to New York. And he admitted that. And that the woman—the other woman didn't want to get involved. Well, we know she didn't want to get involved because it was Susan DeRosa. She was already asked to give a false alibi, which she refused. And not until after he said that to the state investigators and realized that . . . DeRosa was going to be a witness at the trial did he come at trial and change what he had to say, that he didn't meet the woman until she was down there. The mystery woman in New York who[m] he doesn't want to give the name to."

We long have held that a prosecutor may not comment on evidence that is not a part of the record and may not comment unfairly on the evidence in the record. See, e.g., *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002). In the present case, the state's attorney clearly introduced evidence during her rebuttal argument that DeRosa was the unidentified woman whom Dimitriadis testified he was with in New York. A review of the record, however, demonstrates that no evidence was adduced at trial to establish that DeRosa was the woman Dimitriadis refused to identify.

The state argues that the state's attorney merely was attempting to demonstrate that "Dimitriadis was providing a false alibi and that no one . . . . went to New York on the day in question." The state further claims that the state's attorney simply was suggesting that the "jury could reasonably infer" that Dimitriadis would not identify the mystery woman because that woman was DeRosa, and she would not corroborate his story. Although "[i]t is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom"; (internal quotation marks omitted) *State* v. *Thompson*, supra, 266 Conn. 465; in this instance, no juror possibly could have drawn the inference that

DeRosa was the unidentified woman from the evidence presented at trial.

Despite any inconsistencies between what Dimitriadis said to the state investigator and what he said in court, no evidence of this inconsistency or evidence identifying DeRosa as the mystery woman was presented at trial. Even though DeRosa testified that the defendant had asked her to provide an alibi and declined, this does not create a logical inference that DeRosa was the mystery woman whom Dimitriadis refused to identify. The state's attorney, therefore, introduced facts not in evidence during her rebuttal argument, and we agree with the defendant and the Appellate Court that this constituted prosecutorial impropriety.

### III

We now turn to whether the impropriety, namely, the improper introduction of a fact not in evidence, deprived the defendant of a fair trial. See, e.g., *State* v. *Ritrovato*, supra, 280 Conn. 66; see also *State* v. *Stevenson*, supra, 269 Conn. 575; *State* v. *Williams*, supra, 204 Conn. 539–40. The defendant claims that the prosecutorial impropriety in this case was harmful because it was so egregious that it deprived him of his constitutional right to a fair trial under the due process clauses of both the state and federal constitutions. In analyzing the defendant's claim, "we ask whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 539. We do not, however, focus only on the conduct of the state's attorney. "The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial [impropriety]." (Internal quotation marks omitted.) Id., 539–40.

To determine whether the sole instance of impropriety deprived the defendant of a fair trial, we must examine it under each of the *Williams* factors. See id., 540. Specifically, we must determine whether (1) the impropriety was invited by the defense, (2) the impropriety was severe, (3) the impropriety was frequent, (4) the impropriety was central to a critical issue in the case, (5) the impropriety was cured or ameliorated by a specific jury charge, and (6) the state's case against the defendant was weak due to a lack of physical evidence. Id. On the basis of our examination, we conclude that the prosecutorial impropriety did not deprive the defendant of a fair trial.

We begin by determining whether the impropriety was invited by the defense during the trial. We conclude that the impropriety was not invited.

We next consider whether the impropriety, made during rebuttal argument, was frequent or severe. The statement was a discrete occurrence and, therefore, was not frequent. In determining whether the prosecutorial impropriety was severe, this court "consider[s] it highly significant that defense counsel failed to object to . . . the improper [remark], [to] request curative instructions, or [to] move for a mistrial." *State* v. *Thompson*, supra, 266 Conn. 479. A failure to object demonstrates that defense counsel "presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." *State* v. *Reynolds*, supra, 264 Conn. 165. In the present case, defense counsel did not object to the improper comment at trial.

Beyond defense counsel's failure to object, in determining the severity of prosecutorial impropriety, we look to whether the impropriety was blatantly egregious or inexcusable. See *State* v. *Thompson*, supra, 266 Conn. 480. The state's attorney's comment that DeRosa

was the woman whom Dimitriadis declined to identify during his testimony was mitigated by other comments that the state's attorney had made contemporaneously with the improper comment. Specifically, the state's attorney made certain comments that tended to vouch for the alibi of the defendant. For example, the state's attorney noted in the same discussion that "[Dimitriadis] also admitted . . . [that] four of them . . . left from Norwalk and went down to New York," that "[Dimitriadis] didn't meet the woman until she was [in New York]," and that DeRosa was "[t]he mystery woman in New York who[m] he doesn't want to give the name to." Although these statements indicate prosecutorial knowledge of a fact not in evidence, they also tend to suggest that the defendant's alibi, namely, that he was in New York during one of the robberies, was truthful. By seemingly confirming that a trip to New York did, in fact, take place, the state's attorney mitigated the impact of her impropriety. As the sole instance of impropriety was mitigated by the state's attorney's own statements, and because defense counsel did not object to the impropriety at trial, we conclude that it was not severe.

We now look to whether the impropriety was central to a critical issue in the case. The jury's resolution of the issues in the case depended, in large part, on weighing the credibility of the state's witnesses against the credibility of the defense witnesses. As we previously have stated, this case required the jury to determine which witnesses were telling the truth. Thus, the credibility of these witnesses was central to the jury's determination of guilt. In the present case, the introduction of a fact not in evidence tended to impeach the testimony of Dimitriadis. The defendant claims that the statement that DeRosa was the woman whom Dimitriadis declined to identify during his testimony effectively impeached his testimony, as the state attempted to per-

suade the jury to draw the conclusion that Dimitriadis told inconsistent stories to a state investigator and to the jury. Viewed in the context of the rest of the trial, however, the impact of the impropriety was minimal. Beyond the fact that this statement may have tended to confirm the defendant's alibi, this impropriety was not the only impeachment of Dimitriadis. Evidence adduced at trial established that Dimitriadis was a friend of the defendant and that he had approached DeRosa to provide a false alibi for the defendant. Furthermore, the testimony of Dimitriadis and DeRosa notwithstanding, the impropriety did not impact the accomplice testimony of either Lasko or Parisi, or the eyewitness testimony of the victims. Thus, although the impropriety did implicate the credibility of a defense alibi witness, it did not meaningfully impact the central issues in this case.

We now turn to whether the court adopted curative measures to ameliorate the impropriety. The defendant did not object to the impropriety at the time it was made, and the defendant did not request the court to give any curative instructions. In fact, the court specifically asked defense counsel if he had any problem with the court's jury instructions, and he did not request a curative instruction at that time.

Finally, the state's case was strong in view of the testimony of the victims, the accomplice witnesses and DeRosa. Although there was no physical evidence linking the defendant to these crimes, and none of the victims positively could identify any of the robbers, two of the defendant's accomplices testified against him, placing him at each of the robberies. They also explained the events surrounding the robberies, and much of their testimony was corroborated by the victims. Additionally, DeRosa testified that the defendant had asked her to provide him with a false alibi. The

state's case, therefore, was quite strong, independent of the prosecutorial impropriety.

Considering the sole instance of prosecutorial impropriety within the framework of the entire trial, we conclude that the defendant was not denied a fair trial under the *Williams* standard, and, therefore, reversal of the defendant's convictions is unwarranted.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.