******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* ELMER G.[1]
## (AC 37596)

Alvord, Prescott and Pellegrino, Js.

*Syllabus*

Convicted of two counts each of the crimes of sexual assault in the second
degree and risk of injury to a child, and of three counts of the crime
of criminal violation of a restraining order in connection with his alleged
sexual abuse of the victim, his daughter, the defendant appealed to this
court. He claimed, inter alia, that the evidence was insufficient to support
his conviction of one of the counts of sexual assault in the second
degree, which was based on his alleged conduct in compelling the victim
to engage in fellatio, and all three counts of criminal violation of a
restraining order. *Held*:

1. The evidence was sufficient to support the defendant's conviction of
sexual assault in the second degree, the state having presented sufficient
evidence to prove that the defendant's penis entered into the victim's
mouth to some degree, however slight, to establish penetration; on the
basis of the victim's testimony, the jury reasonably could have found
that the victim performed fellatio on the defendant and that during the
course of doing so, the defendant's penis passed into her mouth, and,
on the basis of its firsthand observation of the victim's conduct,
demeanor and attitude when answering the prosecutor's questions, the
jury reasonably could have construed against the defendant any ambigu-
ity in the victim's testimony concerning penetration.

2. The defendant could not prevail on his claim that the evidence was
insufficient to support his conviction of three counts of criminal violation
of a restraining order because the state failed to prove that the ex parte
and temporary restraining orders that were issued applied to the victim
or that he knew the parameters of those orders: although the restraining
orders identified the victim's mother as the protected person, they also
stated that they protected the minor children of the protected person,
namely, the victim and her siblings, the court specifically informed the
defendant at a hearing that although he could have some contact with
the children, that contact was limited to weekly, supervised visits, and,
therefore, there was sufficient evidence to prove that the restraining
orders prohibited the defendant from contacting the victim outside of
their weekly, supervised visits; moreover, although the restraining orders
were in English and the defendant spoke Spanish, there was sufficient
evidence to prove that he knew the terms of the temporary restraining
order and that it prohibited him from contacting the victim outside of
the weekly, supervised visits, defense counsel having represented to
the court that he was fluent in Spanish and had reviewed the terms of the
orders with the defendant, and the court, through a Spanish interpreter,
having advised the defendant that his contact with his children was
limited, and even if there was an inadequate evidentiary basis for
determining that the defendant knew the terms of the ex parte restraining
order, the evidence nevertheless was sufficient to support his conviction,
as two counts of the restraining order information pertained to conduct
that occurred during the effective period of the temporary restraining
order, not the ex parte restraining order, and although the conduct
alleged in the third count encompassed the effective periods of both
restraining orders, there was sufficient evidence presented at trial to
prove that the defendant sent a letter to the victim and that she received
the letter during the effective period of the temporary restraining order.

3. The defendant's claim that he was deprived of a fair trial as a result of
prosecutorial improprieties was unavailing: in claiming that certain of
the prosecutor's questions constituted improper attempts to bolster
the victim's credibility, the defendant was attempting to transform an
unpreserved evidentiary claim challenging the admission of testimony
into a constitutional claim of prosecutorial impropriety, and this court
declined to review such an unpreserved evidentiary claim under the
prosecutorial impropriety framework; moreover, in the context of his
entire closing argument, the prosecutor, by arguing in detail why the

substance of the victim's testimony, her demeanor on the witness stand and the sum of the evidence presented supported a finding that the victim was not fabricating the allegations, did not improperly vouch for the credibility of the victim but, rather, appealed to the jurors' common sense and invited them to draw a conclusion on the basis of a rational appraisal of the evidence, the prosecutor did not attempt to create sympathy for the victim and thereby inject extraneous matters into the trial when he asked the jurors to use their common sense to infer that the victim's testimony was more credible because of the hardships that she had endured as a result of bringing the allegations against the defendant, and the prosecutor's reference to statements about the sexual abuse that the victim made to her school guidance counselor, who did not testify at trial, was based on facts in evidence and was not improper, as the jury reasonably could have concluded, from the testimony of the victim and a detective to whom the victim gave a statement, that the victim had told her guidance counselor about the assault.

(*One judge concurring separately*)

Argued May 16—officially released September 12, 2017

*Procedural History*

Two substitution informations charging the defendant, in the first case, with three counts each of the crimes of sexual assault in the second degree and risk of injury to a child, and, in the second case, with three counts of the crime of criminal violation of a restraining order, brought to the Superior Court in the judicial district of Danbury, where the cases were consolidated and tried to the jury before *Pavia, J.*; verdicts and judgments of guilty of two counts each of sexual assault in the second degree and risk of injury to a child, and three counts of criminal violation of a restraining order, from which the defendant appealed to this court. *Affirmed.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *Warren C. Murray*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Elmer G., appeals from the judgments of conviction, after a jury trial, of two counts of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2), and three counts of criminal violation of a restraining order in violation of General Statutes § 53a-223b. On appeal, the defendant claims that (1) there was insufficient evidence presented at trial to convict him of one of the two counts of sexual assault in the second degree and all three counts of criminal violation of a restraining order, and (2) certain prosecutorial improprieties at trial deprived him of his right to a fair trial. We disagree and, accordingly, affirm the judgments of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. The victim is the defendant's daughter. The victim was born in Guatemala and lived there until July, 2010. In Guatemala, family members raised the victim and four of her siblings (Guatemalan siblings) while their parents, the defendant and A.N., and four younger siblings (American siblings) resided together in Connecticut.[2] The victim remembered meeting the defendant for the first time in 2007, when she was approximately ten years old. During that visit, the defendant began touching the victim in a sexually inappropriate manner. In the summer of 2010, the defendant arranged for two relatives to bring the victim, who was thirteen years old, to Connecticut illegally. Before she left Guatemala, the defendant told her "to get a shot for pregnancy, to avoid pregnancies . . . ." Approximately two weeks after arriving in Connecticut, the defendant resumed his sexual abuse of the victim and compelled her to engage in various sexual acts, including penile-vaginal intercourse and fellatio.

In June, 2011, the Department of Children and Families (department) conducted an investigation into allegations that the defendant was physically abusing his son, one of the victim's American brothers. In January, 2012, the department conducted another investigation into domestic violence after the victim's brother told someone at school that the defendant had brandished a knife at home, threatened his mother, A.N., and cut A.N.'s leg with the knife. At about this time, the defendant returned to Guatemala for a planned visit. Because the department was concerned about the well-being of A.N. and her children upon the defendant's return from Guatemala, it helped A.N. secure new housing for herself and her children.

When the defendant learned of these events from relatives, he called A.N. to discuss the situation. Because A.N. was fearful of the defendant coming to

her new residence when he returned to Connecticut, on March 2, 2012, she applied for and was issued a two week, ex parte restraining order against the defendant, which protected herself and her children in Connecticut. On March 5, 2012, the defendant received in-hand marshal service of the ex parte restraining order. On March 15, 2012, after a hearing, A.N. was issued a six month restraining order (temporary restraining order) against the defendant, which protected herself and her children in Connecticut. While the ex parte restraining order and the temporary restraining order (collectively, restraining orders) were in effect, the defendant continued to communicate with the victim in a manner that violated these orders.

After the department became involved with the victim's family in January, 2012, it referred the family to Altagracia Lara, an intensive family preservation clinician with Catholic Charities. During her conversations with the victim, Lara became concerned about the victim's relationship with the defendant and called the victim's pastor, Lourdes Lopez, and encouraged her to talk to the victim. On April 8, 2012, Lopez noticed that the victim was crying after church services and approached her to determine what was wrong. When the victim was not being responsive, Lopez brought the victim into her office, encouraged the victim to tell her what was wrong, and reassured the victim that she could trust her. The victim told Lopez that the defendant was physically and sexually abusing her. Lopez drove the victim home so they could speak with A.N. about her disclosure, and she called Lara, who reported the allegation to the department. The next morning, April 9, 2012, A.N. and Lara brought the victim to the police station to report the sexual abuse. After providing a written statement to the police, the victim was examined by a forensic pediatrician. The pediatrician found "very deep notches" in the victim's hymen, which was consistent with vaginal penetration and, after a second examination, diagnosed the victim with a sexually transmitted infection.

The defendant was subsequently charged in two informations, one alleging, inter alia, that he sexually abused the victim, and one alleging that he violated the restraining orders. In the operative sexual assault information, the defendant was charged with three counts of sexual assault in the second degree and three counts of risk of injury to a child. In the operative restraining order information, the defendant was charged with three counts of criminal violation of a restraining order. After a joint trial on both informations, the jury found the defendant guilty of two counts of sexual assault in the second degree, two counts of risk of injury to a child, and three counts of criminal violation of a restraining order. The jury found the defendant not guilty of one count of sexual assault in the second degree and one count of risk of injury to a

child. The court sentenced the defendant to a total effective term of forty years of imprisonment, execution suspended after twenty-five years, followed by twenty-five years of probation. This appeal followed.

I

We begin with the defendant's claim that there was insufficient evidence presented at trial to convict him of one count of sexual assault in the second degree based on fellatio and three counts of criminal violation of a restraining order. We conclude that there was sufficient evidence presented at trial to support all of the defendant's convictions.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 16–17, 115 A.3d 447 (2015).

A

The defendant first claims that there was insufficient evidence presented at trial to support his conviction of sexual assault in the second degree based on fellatio. In particular, the defendant argues that the state failed to prove that his penis penetrated the victim's mouth because the victim's testimony was too ambiguous con-

cerning whether penetration occurred. We disagree.

The following additional facts are relevant to this claim. In count five of the sexual assault information, the state alleged, in relevant part, that "between July, 2010, and January, 2012, the [defendant] engaged in sexual intercourse with another person, [the victim], by having said person perform an act of fellatio upon him . . . ." With respect to the charge of sexual assault in the second degree that was based on fellatio, the state engaged in the following colloquy with the victim:

"[The Prosecutor]: And could you just indicate to the ladies and gentlemen of the jury what you remember?

"[The Victim]: He asked me to do oral sex.

"[The Prosecutor]: And what do you remember about that specific event, if you can just tell the ladies and gentlemen of the jury?

"[The Victim]: Always with threats.

"[The Prosecutor]: The actual incident itself, could you describe the incident itself, could you describe the incident?

"[The Victim]: He made me put my mouth in his penis.

"[The Prosecutor]: I'm sorry. Say that again?

"[The Victim]: He made me—he forced me to put my mouth on his penis.

"[The Prosecutor]: Okay. Did—did he actually penetrate your mouth?

"[The Victim]: No.

"[The Prosecutor]: What do you mean? How about your lips?

"[The Victim]: Yes."

"A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and . . . [s]uch other person is thirteen years of age or older but under sixteen years of age and the actor is more than three years older than such other person . . . ." General Statutes § 53a-71 (a) (1). The definition of "sexual intercourse" includes "fellatio . . . between persons regardless of sex. . . ." General Statutes § 53a-65 (2). "Penetration, however slight, is sufficient to complete . . . fellatio and does not require emission of semen. . . ." General Statutes § 53a-65 (2). When analyzing our Penal Code's definition of penetration, our Supreme Court has observed: " 'Penetration' is defined as 'the act or process of penetrating,' and 'penetrate' means 'to pass *into* or through' or 'to extend *into* the *interior* of . . . .'" (Emphasis in original.) *State* v. *Scott*, 256 Conn. 517, 532, 779 A.2d 702 (2001). Thus, to prove sexual assault based on fellatio, "it is necessary for the state to establish that the defendant intended to insert his penis *into* the victim's

mouth." (Emphasis in original.) Id., 533. Sexual acts that do not involve the defendant's penis entering the victim's mouth, such as the act of licking a penis, are insufficient to prove penetration because licking "involves *extending* the tongue *from* the mouth, not *inserting* the penis *into* the mouth." (Emphasis in original.) Id.

We conclude that the state presented sufficient evidence to prove that the defendant's penis entered into the victim's mouth to some degree, however slight. The victim testified that the defendant "asked [her] to do oral sex," i.e., "he forced [her] to put [her] mouth on his penis," and she responded affirmatively when the prosecutor asked her if, in doing so, the defendant's penis penetrated her lips. On the basis of this testimony, the jury reasonably could have concluded that the victim performed fellatio on the defendant and that during the course of performing fellatio the defendant's penis passed into her mouth.

The defendant disagrees, arguing that the victim's testimony that his penis did not penetrate her mouth rendered her testimony concerning penetration too ambiguous as a matter of law to support his conviction. In particular, the defendant relies on *State* v. *Hicks*, 319 N.C. 84, 90, 352 S.E.2d 424 (1987). In that North Carolina Supreme Court case, the defendant was charged, inter alia, with a first degree sexual offense on the basis of his alleged anal penetration of the victim. Id., 89–90. At trial, the only evidence of anal penetration was the seven year old victim's testimony that the defendant " 'put his penis in the back of me.' " Id., 90. Although a physical examination of the victim "revealed a broken hymen and a genital rash that appeared to be a yeast infection"; id., 86; the examining physician testified that he found no evidence of anal intercourse. Id., 90. The North Carolina Supreme Court concluded: "Given the ambiguity of [the victim's] testimony as to anal intercourse, and absent corroborative evidence (such as physiological or demonstrative evidence) that anal intercourse occurred, we hold that as a matter of law the evidence was insufficient to support a verdict . . . ." Id.

The defendant argues that this case is analogous to *Hicks* because the victim's negative response to the prosecutor's question about whether "he actually penetrate[d] your mouth" and affirmative response to the prosecutor's question—"How about your lips?"—rendered her testimony concerning penetration too ambiguous as a matter of law to support his conviction. We disagree. The victim, who was testifying with the assistance of a Spanish interpreter, might simply have misunderstood the prosecutor's first question, and her misapprehension might have been apparent in her demeanor, as observed by the jury, when responding to the prosecutor's questions. In reviewing sufficiency

of the evidence claims, "[w]e do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005). "It is . . . the absolute right and responsibility of the jury to weigh conflicting evidence and to determine the credibility of the witnesses. . . . [T]he [jury] can . . . decide what—all, none or some—of a witness' testimony to accept or reject. . . . A trier of fact is free to reject testimony even if it is uncontradicted . . . and is equally free to reject part of the testimony of a witness even if other parts have been found credible." (Internal quotation marks omitted.) *State* v. *Francione*, 136 Conn. App. 302, 311–12, 46 A.3d 219, cert. denied, 306 Conn. 903, 52 A.3d 730 (2012). On the basis of its firsthand observation of the victim's conduct, demeanor, and attitude when answering the prosecutor's questions, the jury reasonably could have construed any ambiguity in the victim's testimony concerning penetration against the defendant.

In addition, the state elicited more details from the victim about fellatio than were elicited from the seven year old victim in *Hicks* about the alleged anal sex. Prior to responding to the prosecutor's questions about penetration, the victim testified that the defendant "asked me to do oral sex" and that "he forced me to put my mouth on his penis." The jurors, on the basis of their common sense and life experiences, could have reasonably inferred that the seventeen year old victim understood what oral sex under these circumstances ordinarily involves, i.e., a man's penis entering someone's mouth. The jurors also reasonably could have inferred that when she stated that she put her mouth *on* the defendant's penis—in direct response to the prosecutor's request for specific details about the time she performed oral sex on the defendant—that she did more than simply place the lips of her mouth against the defendant's penis. That is, she placed her mouth on the defendant's penis in a manner that caused his penis to enter into her mouth.

Accordingly, we conclude that there was sufficient evidence presented at trial to support the defendant's conviction of sexual assault in the second degree based on fellatio.

B

The defendant next claims that there was insufficient evidence presented at trial to support his conviction of three counts of criminal violation of a restraining order because the state failed to prove (1) that the restraining orders applied to the victim or (2) that he knew the parameters of the restraining orders. The defendant

further claims that the state failed to prove that he sent the victim a letter while either of the restraining orders were in effect.

The following additional facts are relevant to these claims. The defendant was in Guatemala from January, 2012, into early March, 2012. On March 2, 2012, A.N. was issued an ex parte restraining order against the defendant in anticipation of his imminent return to the United States. The ex parte restraining order identified A.N. as the "Protected Person" and prohibited the defendant from, inter alia, contacting "the protected person in any manner, including by written, electronic or telephone contact . . . ." With respect to the couple's minor children, the ex parte restraining order (1) stated that "[t]his order also protects the protected person's minor children"; (2) awarded temporary custody of the couple's minor children to A.N.; and (3) denied the defendant visitation rights. The order listed the names and birthdays of the couple's five minor children residing in the United States, including the victim. The order also stated that a hearing was scheduled for March 15, 2012, at 9:30 a.m., the same day that the ex parte restraining order expired. The defendant received in-hand marshal service of the ex parte restraining order on March 5, 2012.

On March 15, 2012, A.N. was issued a temporary restraining order against the defendant after a hearing. The temporary restraining order identified the protected person as A.N. and prohibited the defendant, inter alia, from contacting "the protected person in any manner, including by written, electronic or telephone contact . . . ." With respect to the couple's minor children, the temporary restraining order stated that (1) "[t]his order also protects the protected person's minor children," and (2) the defendant may have "[w]eekly supervised visits with [the] children."

The terms of the temporary restraining order were reviewed with the parties during the temporary restraining order hearing. Specifically, at the temporary restraining order hearing, the defendant was present and represented by Attorney Thomas Wolff. At the beginning of the hearing, the defendant consented to having an employee from the department serve as a Spanish language interpreter. Additionally, Wolff informed the court that he was fluent in Spanish and that he would ensure that his client, the defendant, understood what was being said during the proceeding. Wolff then stated that he and the victim advocate had reviewed the proposed temporary restraining order with the defendant and that they had answered all of the defendant's questions about the proposed order. Wolff represented that the defendant was no longer contesting the temporary restraining order. Thereafter, the court engaged in the following colloquy with the victim advocate:

"The Court: I told you what was going to be the tenor of my orders, and I asked you to see if you could work out particulars just so that I don't enter something impractical for the parties. Were you able to do that?

"The Victim Advocate: Yes, Your Honor.

"The Court: Okay. Why don't you tell me the essence of what you've worked out.

"The Victim Advocate: What we've agreed upon is that it would be considered a no contact restraining order.

"The Court: As far as mom is concerned?

"The Victim Advocate: As far as mom is concerned.

"The Court: Right.

"The Victim Advocate: *Contact with the kids* [*will*] *be limited to weekly supervised visits.*

"The Court: *Contact with minor children weekly, supervised.* Yes . . . .

"The Victim Advocate: He would like to visit them as soon as possible, so next week would be the only option available. I provided him with the number, and they both agreed on third party contact regarding the children be made through either [S.G.] or [C.T.]." (Emphasis added.)

After further discussion concerning the terms of the order, Wolff agreed with the terms of the order as summarized by the victim advocate. He also reminded the court that the order would pertain only to the defendant and A.N.'s children who resided in the United States, and the court agreed that it had no jurisdiction over the children in Guatemala. The court then instructed the defendant as follows: "So, with that in mind, I am going to order a temporary restraining order. Now, as to [A.N.] and the five children, sir, you are not to assault, threaten, abuse, harass, follow, interfere with or stalk. You are to stay away from the home of [A.N.], or wherever she's residing, and you're not to contact her in any manner. As far as the children are concerned, *you can have contact with your children, but for now we need it supervised. It's to be weekly and supervised.* . . . Any contact that you need to have with your wife, or that your wife needs to have with you, will go through a third party, either [S.G.] or [C.T.]." (Emphasis added.) Thereafter, the defendant began supervised visits with all of his American children except the victim, who refused to attend these visits. The victim testified that the defendant persisted in his attempts to contact her, however, by phone and by sending her messages through her siblings.

In the operative restraining order information, the defendant was charged with three counts of criminal violation of a restraining order. Count one alleged, in

relevant part: "[The defendant] contacted [the victim] in violation of a restraining order . . . . [The defendant] had knowledge of the restraining order and contacted [the victim] by text message on March 28, 2012 . . . ." Count two alleged, in relevant part: "[The defendant] contacted [the victim] in violation of a restraining order . . . . [The defendant] had knowledge of the restraining order and contacted [the victim] by text message on April 10, 2012 . . . ." Count three alleged, in relevant part: "[The defendant] contacted [the victim] in violation of a restraining order . . . . [The defendant] had knowledge of the restraining order and contacted [the victim] by letter between March 5, 2012, and April 10, 2012 . . . ."

At trial, the ex parte restraining order, the temporary restraining order, and a redacted portion of the transcript from the temporary restraining order hearing were entered into evidence. The victim testified that after the restraining orders were issued, the defendant continued to call her and send her text messages on a regular basis but she typically ignored his calls and deleted his text messages. She stated that she specifically recalled receiving a text message from the defendant in March, 2012, because she reported that text message to the police. The victim further explained that she eventually changed her cell phone number in order to avoid the defendant's attempts to contact her. In April, 2012, however, the victim stated that one of her brothers brought her a letter and a new cell phone from the defendant. The victim identified the handwriting in the letter as the defendant's handwriting. She also stated that she received a text message from the defendant on the cell phone that he provided her on April 10, 2012.

Lara, the family's intensive family preservation clinician, also testified concerning the defendant's efforts to contact the victim while the temporary restraining order was in effect. Lara stated that on March 28, 2012, she went with the victim to the police station to report a text message the defendant sent the victim earlier that day.[3] In addition, Lara testified that when she went with the victim and A.N. to the police station to report the defendant's sexual abuse on April 9, 2012, they brought the letter that the defendant sent the victim, which she translated from Spanish into English at the police station.

In the translated letter, which was admitted into evidence, the defendant references watching the victim leave church and go to "Denis dinner" with her friends. The defendant warns the victim that her church friends are taking advantage of her. He repeatedly pleads with the victim to call him, text message him, or meet with him, and he references providing her with a new cell phone. The defendant also states: "I don't have any issues with you, all the nice things you used to say

and now you are saying other things." The defendant proceeds to ask the victim "to forgive me, if you want to be in God's mercy forgive me, and if not go ahead and live with resentment."

To convict a defendant of criminal violation of a restraining order, the state must prove beyond a reasonable doubt that a restraining order was issued against the defendant and that the defendant, having knowledge of the terms of the order, contacted a person in violation of the order. General Statutes § 53a-223b (a) (2) (B); *State* v. *Carter*, 151 Conn. App. 527, 534–35, 95 A.3d 1201 (2014), appeal dismissed, 320 Conn. 564, 132 A.3d 729 (2016) (certification improvidently granted). The defendant claims that the state failed to prove that the restraining orders applied to the victim, that he knew that the restraining orders prohibited him from contacting the victim, and that he sent the victim the letter during the effective periods of the restraining orders. We address each claim in turn.

The defendant first claims that the state failed to prove that the restraining orders applied to the victim. We disagree. Although the restraining orders identified A.N. as the protected person, they also stated that the order "protects the protected person's minor children," i.e., the victim and her American siblings. In addition, at the temporary restraining order hearing, the court specifically informed the defendant that, although he could have some contact with his children, that contact was going to be limited to weekly, supervised visits. Viewing this evidence as we must, in a light most favorable to sustaining the verdict, we conclude that there was sufficient evidence presented at trial to prove that the restraining orders prohibited the defendant from contacting the victim outside of their weekly, supervised visits.

The defendant next claims that there was no evidence presented at trial that he knew the terms of the restraining orders because they were in English and he speaks Spanish. We conclude that there is sufficient evidence to prove that the defendant knew the terms of the temporary restraining order, and, as a result, there was sufficient evidence presented at trial to support the defendant's conviction of three counts of criminal violation of a restraining order. At the temporary restraining order hearing, Wolff represented that he was fluent in Spanish and that he and the victim advocate had reviewed the terms of the proposed order with the defendant and answered all of his questions concerning its terms. In addition, the court advised the defendant through the agreed upon Spanish language interpreter that his contact with his children would be limited to weekly, supervised visits for the time being. Finally, the fact that the defendant asked the victim's brother to bring her the letter and new cell phone rather than delivering these items to the victim himself suggests

that the defendant knew that he could not have contact with the victim outside of their weekly, supervised visits, which the victim was refusing to attend. As a result, the jury reasonably could have concluded that the defendant knew that the temporary restraining order prohibited him from contacting the victim outside of their weekly, supervised visits.

It is unclear, however, whether there was sufficient evidence presented at trial to prove beyond a reasonable doubt that the defendant knew that the terms of the ex parte restraining order prohibited him from contacting the victim. On the one hand, the defendant appears to have understood the ex parte restraining order enough to know that he needed to attend the March 15, 2012 hearing; in fact, he brought counsel to that hearing. On the other hand, there was no evidence presented at trial that the defendant, a Guatemalan native, was able to read and write in English. Indeed, throughout the restraining order and criminal proceedings, the defendant required the assistance of a Spanish language interpreter. The defendant's text messages that were entered into evidence were all in Spanish, and the victim testified that the defendant only "knew a little bit" of English. In addition, there was no evidence presented at trial that Wolff or anyone else translated the terms of the ex parte restraining order for the defendant. Nevertheless, even if there were an inadequate evidentiary basis for determining that the defendant knew the terms of the ex parte restraining order, we would still conclude that there was sufficient evidence presented at trial to support the defendant's conviction.

Counts one and two of the restraining order information pertain to conduct that occurred during the effective period of the temporary restraining order, not the ex parte restraining order. The conduct alleged in count three does encompass the effective periods of both restraining orders, but there was sufficient evidence presented at trial to prove that the defendant sent and the victim received the letter during the effective period of the temporary restraining order. First, the defendant sent the victim the letter through her brother. The defendant was not authorized to visit his children after the ex parte restraining order was issued and before the temporary restraining order authorized supervised visits. Therefore, the jury reasonably could have concluded that the victim's brother obtained the letter from the defendant during one of their supervised visits after the temporary restraining order was issued. In addition, the victim testified that she received the letter from her brother around April, 2012, and the jury could have reasonably inferred from that that the victim's brother, who lived with the victim, provided the victim with the letter shortly after receiving it.[4] It also was established at trial that, after the temporary restraining order was issued, the victim refused to attend her supervised visits with the defendant and changed her cell phone number

to stop the defendant from contacting her. In his letter, the defendant repeatedly pleads with the victim to contact or meet with him, and, with the letter, the defendant sent the victim a new cell phone. The jury reasonably could have inferred that these pleas were in direct response to the victim's refusal to answer his calls and text messages or to attend their supervised visits. Similarly, the jury reasonably could have inferred that the reason the defendant was providing the victim with a new cell phone was that he was presently unable to reach her by phone because he did not have her new cell phone number.

Mindful as we are that in determining the sufficiency of the evidence we must consider its cumulative effect and construe the evidence in the light most favorable to sustaining the verdict, we determine that there was sufficient evidence presented at trial to support the defendant's conviction of criminal violation of a restraining order.

## II

We next address the defendant's claims of prosecutorial impropriety.[5] The defendant claims that the prosecutor improperly bolstered the credibility of two state's witnesses on direct examination and redirect examination. The defendant also claims that during closing argument the prosecutor improperly vouched for the credibility of the victim, attempted to create sympathy for the victim and thereby injected extraneous matters into the trial, and referred to facts not in evidence.

We review claims of prosecutorial impropriety under a two step analytical process. "We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Citations omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007). Specifically, in analyzing harm, "we ask whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not, however, focus only on the conduct of the state's attorney. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial [impropriety]. . . .

"To determine whether . . . [an] impropriety deprived the defendant of a fair trial, we must examine it under each of the *Williams* factors.[6] . . . Specifically, we must determine whether (1) the impropriety was invited by the defense, (2) the impropriety was

severe, (3) the impropriety was frequent, (4) the impropriety was central to a critical issue in the case, (5) the impropriety was cured or ameliorated by a specific jury charge, and (6) the state's case against the defendant was weak due to a lack of physical evidence." (Citations omitted; footnote added; internal quotation marks omitted.) Id., 50–51.

A

We begin with the defendant's claims that the prosecutor improperly bolstered the credibility of two state's witnesses on direct examination and redirect examination. The defendant claims that the prosecutor improperly asked the victim on direct examination, "are you making this stuff up," and, "[h]as anybody put you up to testifying the way that you have testified here today in court?" The defendant also claims that the prosecutor improperly asked Pastor Lopez on redirect examination whether she was telling the truth about why she talked to the victim about her relationship with the defendant on April 8, 2012. We conclude that these claims are evidentiary in nature and, therefore, unreviewable under the prosecutorial impropriety framework.

The following additional facts are relevant to these claims. The defense's theory of the case at trial was that the victim fabricated the sexual abuse allegations because A.N. had a new boyfriend and wanted to divorce the defendant, because the victim resented the defendant asking her to babysit her younger siblings and to perform household chores, and to obtain "U-Visas" for herself, A.N., and her Guatemalan siblings.[7] At the end of direct examination, the prosecutor engaged in the following colloquy with the victim:

"[The Prosecutor]: [A]*re you making this stuff up?*

"[The Victim]: No.

"[The Prosecutor]: *Has anybody put you up to testifying the way that you have testified here today in court?*

"[The Victim]: No.

"[The Prosecutor]: In your own words, why are you doing it?

"[The Victim]: Because I wanted to get out of the life that I had with him." (Emphasis added.)

The following day, Pastor Lopez testified about her relationship with the victim and the victim's disclosure that the defendant was sexually abusing her. On direct examination, Lopez testified that she planned to ask the victim about her home life prior to seeing the victim crying after church on April 8, 2012, because she and her husband were troubled by the victim's behavior. Lopez explained that she specifically chose to approach the victim on April 8, 2012, "[b]ecause I realized that she was very weak, and I felt that that was the right

time to talk to her and see if we could help her out." On cross-examination, defense counsel confronted Lopez concerning the reason she decided to talk to the victim about her father. In relevant part, defense counsel engaged in the following colloquy with Lopez:

"[Defense Counsel]: And you said this was a decision on your own [i.e., to talk to the victim about her father]?

"[Lopez]: Oh, you're just trying to confuse me.

"[Defense Counsel]: Do you know a woman named Altagracia—Altagracia Lara?

"[Lopez]: Yes. When she called me just to—asking me that, that was a confirmation of what I already observed based on [the victim's] attitude. But that didn't have anything to do with the church. . . .

"[Defense Counsel]: It was Altagracia Lara who asked you to ask [the victim] about if anything was happening with her dad. Isn't that true?

"[Lopez]: Yes.

"[Defense Counsel]: And that is, in fact, why you asked [the victim] about whether anything was happening with her father. True?

"[Lopez]: Yes."

On redirect examination, the prosecutor engaged in the following colloquy with Lopez concerning her decision to talk to the victim about her father:

"[The Prosecutor]: You were asked a series of questions about a conversation you had with Altagracia Lara. Do you recall those?

"[Lopez]: It was just a phone call.

"[The Prosecutor]: And Alta [Lara] asked you to do something, didn't she?

"[Lopez]: She only said to me that since I was closer to [the victim], probably I should ask her about what was going on with her and her dad.

"[The Prosecutor]: So, when you asked [the victim] about what was happening, in your mind, when you asked that question, you had planned to ask that question. Correct?

"[Lopez]: Yes.

"[The Prosecutor]: And you said earlier you chose that moment because you felt she was weak?

"[Lopez]: Yes.

"[The Prosecutor]: In addition to Altagracia [Lara] telling you to ask that question, did you have any intention on asking that question yourself?

"[Lopez]: Yes.

"[The Prosecutor]: *Is that the truth?*

"[Lopez]: Yes. . . .

"[The Prosecutor]: Were you considering asking [the victim] even before Alta [Lara] called you?

"[Lopez]: Yes.

"[The Prosecutor]: And why was—why were you intending to do that?

"[Lopez]: Because of the way [the victim] was behaving." (Emphasis added.)

Defense counsel did not object to any of those questions.

On appeal, the defendant claims that the three emphasized aforementioned questions constituted improper attempts by the prosecutor to bolster the credibility of his witnesses. "Evidence accrediting or supporting a witness's honesty or integrity is not admissible until after the witness's credibility has first been attacked." C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 6.27.2 (a), p. 380; accord *State* v. *Suckley*, 26 Conn. App. 65, 72, 597 A.2d 1285, cert. denied, 221 Conn. 901, 600 A.2d 1028 (1991); see also Conn. Code Evid. §§ 6-6 (a) and 6-11 (b). Once the credibility of a witness has been attacked on cross-examination, however, a party is permitted to rehabilitate that witness' credibility during redirect examination. Relying on these evidentiary principles and our holdings in *State* v. *Juan V.*, 109 Conn. App. 431, 441, 951 A.2d 651, cert. denied, 289 Conn. 931, 958 A.2d 161 (2008), and *State* v. *Albino*, 130 Conn. App. 745, 774–75, 24 A.3d 602 (2011), aff'd on other grounds, 312 Conn. 763, 97 A.3d 478 (2014), the defendant argues that the disputed questions rose to the level of prosecutorial impropriety. Whether these claims constitute unpreserved evidentiary claims or reviewable claims of prosecutorial impropriety bears scrutiny.

In *State* v. *Juan V.*, supra, 109 Conn. App. 440, the defendant claimed that the trial court abused its discretion when it allowed the prosecutor, over his objection, to ask the four year old victim—"'Did you know you were supposed to tell the truth to [the forensic interviewer]?' "—because this question constituted an impermissible attempt by the state to bolster the victim's credibility before the defense put it at issue on cross-examination. Id., 440–41. We rejected the defendant's evidentiary claim, holding that "it is reasonable to conclude that the state was attempting to lay a proper foundation for admissibility of the videotape [of the victim's forensic interview]. Shortly after the court permitted the question at issue, the state concluded its direct examination of [the victim] and informed the court that it was going to seek to introduce portions of the videotaped interview under the *Whelan*[8] and the past recollection recorded exceptions to the rule against hearsay. Both of these exceptions to the rule

against hearsay require the moving party to show that the out-of-court statements were reliable. Consequently, it was reasonable for the court to conclude that the state's question was not intended to bolster the veracity of [the victim] but, instead, was part of the state's effort to lay the requisite foundation for admissibility of the videotaped interview."[9] (Footnotes altered.) Id.

In *State* v. *Albino*, supra, 130 Conn. App. 774–75, we addressed several claims of prosecutorial impropriety, including whether the prosecutor improperly bolstered the credibility of three state's witnesses by asking them if they were telling the truth or if they were prepared to tell the truth on direct examination and on redirect examination.[10] After reviewing the aforementioned evidentiary principles and our holding in *Juan V.*, we stated in *Albino*: "Our review of these questions leads us to the conclusion that the prosecutor improperly attempted to bolster the credibility of several of the state's witnesses." Id., 775. We did not analyze further the role that each witness played in that case or whether their credibility was, or was likely to be, attacked on cross-examination. Indeed, *Albino* contains no analysis of why the prosecutor's questions rose to the level of prosecutorial impropriety, even though the defendant did not object to them at trial and two of the disputed questions occurred on redirect examination.[11]

Because *Juan V.* was addressing an evidentiary claim, not a claim of prosecutorial impropriety, our reliance on that case in *Albino* is problematic. It is well established "that [a]lthough . . . unpreserved claims of prosecutorial impropriety are to be reviewed under the *Williams* factors, that rule does not pertain to mere evidentiary claims masquerading as constitutional violations. . . . Evidentiary claims do not merit review pursuant to *Golding* . . . because they are not of constitutional magnitude. [R]obing garden variety [evidentiary] claims . . . in the majestic garb of constitutional claims does not make such claims constitutional in nature. . . . Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." (Internal quotation marks omitted.) *State* v. *Alex B.*, 150 Conn. App. 584, 589, 90 A.3d 1078, cert. denied, 312 Conn. 924, 94 A.3d 1202 (2014); accord *State* v. *Elias V.*, 168 Conn. App. 321, 341–44, 147 A.3d 1102, cert. denied, 323 Conn. 938, 151 A.3d 386 (2016); *State* v. *Devito*, 159 Conn. App. 560, 574, 124 A.3d 14, cert. denied, 319 Conn. 947, 125 A.3d 1012 (2015); *State* v. *Cromety*, 102 Conn. App. 425, 431, 925 A.2d 1133, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007); see *State* v. *Rowe*, 279 Conn. 139, 151–52, 900 A.2d 1276 (2006). Stated simply, "a defendant may not transform an unpreserved evidentiary claim into one of prosecutorial impropriety to obtain review of that claim . . . ." (Internal quotation marks omitted.) *State* v. *Devito*,

supra, 574.

*Albino* did not analyze whether or why the defendant's claim was not, in fact, an attempt to transform an unpreserved evidentiary claim into one of prosecutorial impropriety to obtain review of that claim. As a result, we conclude that *Albino* does not control because we conclude that the defendant in the present case is attempting to transform his unpreserved evidentiary claims, challenging the admission of testimony, into constitutional claims of prosecutorial impropriety. Consistent with our well established precedent, we decline to review such unpreserved evidentiary claims under the prosecutorial impropriety framework.[12]

B

We next address the defendant's claims that during closing argument the prosecutor improperly vouched for the credibility of the victim, attempted to create sympathy for the victim and thereby inject extraneous matters into the trial, and referred to facts not in evidence. We conclude that no improprieties occurred during closing argument.

The following additional facts are relevant to these claims. During closing argument, both parties focused on the victim's credibility and motivation in making these allegations. In relevant part, the prosecutor made the following remarks during his opening argument, the emphasized portions of which the defendant now challenges: "So, I'm making the argument to you that the attacks on her credibility fall flat. And this creates a problem for the defense. What it does is sort of this, you have this original statement by her, this story which is a compelling story. And then you look to undermine it. And when you look to undermine it what you find out is that the attacks don't really hold much weight. So we engage this thought exercise assuming that he's— that she's dishonest but we find out she's really not based upon her analysis of the evidence.

"So the failure of those—the failure of—we can sort of rule out dishonesty. We've sort of done that. The fabrications—what I'm trying to say is that if we can rule out dishonesty and we can rule out all of those things this sort of strengthening her claim that this [is] a true claim, because that's the only thing that's left. There's an old problem-solving rule it's called Occam's razor, but what it says is, when you have competing hypotheses to try to explain something the simplest explanation is always the best. Why complicate it, why not take [the victim's] words at their face value? *She is saying that she is the victim of incest because she was the victim of incest.* It's not complicated, it's simple. It is just what it appears to be. We don't have to engage in these convoluted attacks on her credibility in order to establish the basic premise.

"Consider this, *if a young girl such as* [*the victim*]

*wanted to fabricate a lie, is this the lie they would fabricate? I would submit to you that there is no young girl that wants to fabricate an untruth of this extent and this magnitude.* Incest is an issue of the utmost (indiscernible), and I'd ask you to give it your due consideration; but don't complicate it, see it as simply as the evidence shows that [the victim] seat it—saw it. . . .

"Just in conclusion, ladies and gentlemen, I—remember what the judge says about credibility. *You [have] seen how a young woman who makes up a claim of sexual assault kind of has to come through and run the legal gauntlet.* Even the members of her family can testify against her. But I think the evidence shows you that [the victim's] testimony has endured, it's remained intact in the core. When the defense was questioning [the victim], and this is important, when they questioned her, and they cross-examined her for [a] long time, they asked her not one question about the events in this house. You got to ask yourself, why did they do that?

"I would submit to you and I would construct the argument that they knew to stay away from that information because that information is radioactive. Once they got into that information, you would see her break down and that's why they stayed away from it. So, what do you do? You do what they did, you attack on the periphery, death by a thousand cuts, death by a thousand suggestions. *I would submit to you that these assaults were real.* I think the core of her testimony remains intact. She told the story [to] Lourdes Lopez. She told it to her mom. She told it to the police. She told it to Dr. Veronica [Ron-Priola, a forensic pediatrician]. *She told it to Julia Jiminez* [the victim's school guidance counselor], and she told it to this jury.

"*Remember what she's had to do. She's went through counseling. She's went through medical exams. She's went through interviews. She's went through court appearances. And she's gone through cross-examination. And after all that, I am arguing to you that this evidence shows she's not fabricating these things. Defense focused on all of the supposed reasons she's fabricating these claims except for one. There's one they left out. And [the victim] was asked about this, she was asked, [the victim], she was sort of asked, you know, why are you saying these things about your father. And here's what she said, 'I had to get out of the life I had with him.' If you were in her position would you feel the same way? This is exactly what a person would say that was in this position.*

"I want to just thank you for your attention. And I, remember—I want you to sort of fix in your mind the image of [the victim] and the type of person she was, and the credibility she ejected as a human being. And I want you to fix that in your mind and think about what the judge has to say about the credibility. *And while you're reflecting on her as a young lady, I want*

*you to consider her honesty as it appears through her testimony* and the way she testified." (Emphasis added.)

Defense counsel began his closing remarks by returning to his theme that the victim fabricated these allegations because A.N. had a new boyfriend and wanted to divorce the defendant, because the victim resented the defendant asking her to babysit her younger siblings and to perform household chores, and to obtain U-Visas for herself, A.N., and her Guatemalan siblings. Defense counsel also argued extensively about why, on the basis of the evidence presented at trial, the jury should not credit the testimony of the victim and other state's witnesses. During rebuttal argument, the prosecutor briefly responded to various points made by defense counsel. He then concluded his argument by making the following remark, the emphasized portion of which the defendant now challenges: "Fabrication, this is how it works; once again, we get right back to the ultimate issue is, are they [the victim and A.N.] telling the truth or are they fabricating this? *I would argue to you that they were truthful when they testified here.* Thank you, ladies and gentlemen." (Emphasis added.)

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . [B]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Elias V.*, supra, 168 Conn. App. 347. The defendant raises various challenges to the emphasized portions of the prosecutor's closing argument. We address each category of impropriety in turn.

1

The defendant first claims that the prosecutor improperly vouched for the credibility of the victim during closing argument by making the following remarks: (1) the victim "is saying that she is the victim of incest because she was the victim of incest"; (2) "I would submit to you these assaults were real"; (3) "[a]nd while you're reflecting on her testimony as a young lady, I want you to consider her honesty as it appears through her testimony and the way she testified"; and (4) "I would argue to you that they [the victim and A.N.] were truthful when they testified here." The state responds that when these remarks are read in the context of the prosecutor's and defense counsel's entire closing arguments, they are not improper. We agree with the state.

"The parameters of the term zealous advocacy are also well settled. The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 363, 897 A.2d 569 (2006).

"We have held, however, that [i]t is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.) *State* v. *Fauci*, supra, 282 Conn. 36. Our Supreme Court previously "has concluded that the state may argue that its witnesses testified credibly, if such an argument is based on reasonable inferences drawn from the evidence. . . . Specifically, the state may argue that a witness has no motive to lie. . . . In addition, jurors, in deciding cases, are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to a jury's common sense in closing remarks." (Citations omitted; internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 365.

Having reviewed the disputed remarks in the context of the prosecutor's entire closing argument, we conclude that the prosecutor did not improperly express his personal belief or opinion that the victim was credible. During his closing argument, the prosecutor argued in detail why the substance of the victim's testimony, her demeanor on the witness stand, and the sum of the evidence presented at trial supported a finding that the victim was not fabricating these allegations as the defendant suggested. In making these arguments, the prosecutor repeatedly admonished the jurors to listen carefully to the court's instruction on credibility and to rely on their common sense, their life experiences, and the evidence presented at trial when making their credibility determinations. When the disputed remarks are viewed in the context of the prosecutor's entire argument, therefore, it becomes clear that the prosecutor

was not expressing his personal opinion about the victim's credibility with these remarks but rather was appealing to the jurors' common sense and inviting them to draw the conclusion on the basis of a rational appraisal of the evidence presented at trial that the victim was not fabricating these allegations.

Accordingly, we conclude that the prosecutor did not express an improper personal opinion concerning the victim's credibility.

2

The defendant next challenges three remarks that the prosecutor made during his opening argument that he claims were improper attempts to create sympathy for the victim and thereby inject extraneous matters into the trial. The state responds that "the prosecutor's comments constituted a fair argument to the jury that they should reject the defendant's challenge to the victim's credibility," not to generate sympathy for the victim. We agree with the state.

Our Supreme Court "has recognized on numerous occasions that [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 54, 975 A.2d 660 (2009). An improper appeal to the jurors' emotions can take the form of "a plea for sympathy for the victim . . . ." Id., 59.

The defendant first challenges two remarks by the prosecutor that, when assessing the credibility of the victim and her motivation for testifying, the jury should consider the hardships the victim has had to endure since making her allegations.[13] We conclude that these remarks did not constitute an invitation by the prosecutor for the jurors to decide the case on the basis of their emotions. Instead, the prosecutor was asking the jurors to use their common sense to infer that the victim's testimony was more credible because of the hardships she has endured as a result of bringing and maintaining her allegations against the defendant, such as invasive medical examinations and embarrassing conversations with strangers and family members about being sexually assaulted on several occasions by her father. Our Supreme Court has repeatedly recognized that this type of argument is permissible and does not constitute an improper appeal to emotions. E.g., *State* v. *Felix R.*, 319 Conn. 1, 10, 124 A.3d 871 (2015) ("statements wherein the prosecutor recounted the difficulties that the victim faced during the investigation and trial"

not improper appeals to emotions); *State* v. *Long*, supra, 293 Conn. 48 ("the comments in which the prosecutor asked the jurors to use their common sense to infer that [the victim's] complaint was more credible because it required her to undergo an uncomfortable medical examination and embarrassing conversations with both her family members and complete strangers, also were proper"); *State* v. *Warholic*, supra, 278 Conn. 377–78 (asking jurors, particularly male jurors, to assess victim's credibility by recognizing emotional difficulty victim subjected himself to by making allegations of sexual assault not improper appeal to emotions), citing *State* v. *Rose*, 353 N.W.2d 565, 568 (Minn. App. 1984) (asking jurors to assess credibility of thirteen year old victim by identifying with difficulty she must have experienced in testifying about sexual assault allegations not improper appeal to emotions), review denied (Minn. September 12, 1984).

The defendant also contends that the prosecutor injected extraneous matters into the trial by remarking that "if a young girl such as [the victim] wanted to fabricate a lie, is this the lie they would fabricate? I would submit to you that there is no young girl that wants to fabricate an untruth of this extent and this magnitude." This remark was clearly designed to rebut defense counsel's various theories for why the victim was fabricating her allegations of sexual assault by calling upon the jury to apply its common sense and life experiences when evaluating the victim's credibility. See, e.g., *State* v. *Warholic*, supra, 278 Conn. 365–66 (asking "jury to consider, in its assessment of [the victim's] credibility, why he would put himself in a position to have to explain to his father that he had performed oral sex on an adult male" constituted proper appeal to jurors' common sense and experience in evaluating victim's testimony). Accordingly, we conclude that this remark was not improper.

3

Finally, the defendant claims that during closing argument the prosecutor improperly referred to facts not in evidence when he stated that the victim told her school guidance counselor, Jiminez, that the defendant sexually abused her because Jiminez never testified at trial.[14] We conclude that the prosecutor did not improperly refer to facts not in evidence during closing argument.

The following additional facts are relevant to this claim. Although Jiminez never testified at trial, she was mentioned during the testimony of the victim and Detective Rachael Halas. In particular, during cross-examination, defense counsel engaged in the following colloquy with the victim concerning her allegations of sexual abuse:

"[Defense Counsel]: And then on April 8 [2012] is

when you reported the allegations to your pastor [Lopez]?

"[The Victim]: Yes.

"[Defense Counsel]: And on April 9th you reported to a social worker named Altagracia Lara?

"[The Victim]: Yes.

"[Defense Counsel]: And that same day, April 9th, you provided the police with that notebook handwritten statement? Correct?

"[The Victim]: Yes.

"[Defense Counsel]: And then on April 13th you go back, and you provide another verbal statement to the police?

"[The Victim]: I don't remember that too well.

"[Defense Counsel]: *Do you remember when your guidance counselor from Danbury High School brought you back to Detective Halas and went over some additional questions*?

"[The Victim]: *Yes*.

"[Defense Counsel]: *And do you remember talking to Mrs. Jiminez, the guidance counselor, in Spanish on that day*?

"[The Victim]: *Yes*.

"[Defense Counsel]: *About the allegations*?

"[The Victim]: *Yes*." (Emphasis added.)

The victim explained later in her testimony that the reason she had to provide an additional statement on April 13, 2012, was so that the police had more details about her allegations against the defendant.

On direct examination, the prosecutor discussed Jiminez with Detective Halas. In particular, Halas testified that she believed that another officer fluent in Spanish and "Julia Jiminez, from Danbury High School," who is "a school counselor" and fluent in Spanish, assisted Halas in taking A.N.'s statement because Halas was not fluent in Spanish. Halas also confirmed on direct and cross-examination that she asked the victim to provide a supplemental statement on April 13, 2012. She explained that she interviewed the victim through a translator and, with the assistance of that translator, wrote the victim's supplemental statement in English. Halas stated that this second interview lasted approximately one and one-half hours.

It is axiomatic that in closing argument parties are permitted to rely on the evidence presented at trial and to argue the reasonable inferences that the jurors might draw therefrom. *State* v. *O'Brien-Veader*, 318 Conn. 514, 547, 122 A.3d 555 (2015) ("[i]t is not improper for the prosecutor to comment upon the evidence pre-

sented at trial and to argue the inferences that the jurors might draw therefrom" [internal quotation marks omitted]); *State* v. *Camacho*, 282 Conn. 328, 377, 924 A.2d 99 ("[a]s a general matter a prosecutor may use any evidence properly admitted at trial"), cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007); *State* v. *Arline*, 223 Conn. 52, 58, 612 A.2d 755 (1992) ("[c]ounsel may comment upon facts properly in evidence and upon reasonable inferences to be drawn from them" [emphasis omitted; internal quotation marks omitted]). Although Jiminez did not testify at trial, it was established through the testimony of the victim and Halas that Jiminez was present for, and indeed served as a translator during, the victim's one and one-half hour interview with Halas on April 13, 2012, during which she provided the police with more details about the defendant's sexual abuse. From that testimony, the jury reasonably could have concluded that the victim "told her story" to Jiminez. Therefore, the prosecutor's reference to Jiminez was based on facts in evidence and not improper.

The judgments are affirmed.

In this opinion PELLEGRINO, J., concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] In addition to his nine children with A.N., the defendant has two additional biological children and one adopted child with another woman in Connecticut.

[3] The police officer who interviewed the victim also testified that the victim came to the police station on March 28, 2012, that she showed him the text message from the defendant, and that the text message at issue was time-stamped from earlier that day.

[4] In April, 2012, the victim's American brothers were between the ages of five and ten, and lived in the same household as her. The victim did not identify which of her brothers delivered the letter.

[5] Although the defendant did not object to all of the improprieties claimed on appeal, they are nevertheless reviewable. "We previously have recognized that a claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis . . . ." (Internal quotation marks omitted.) *State* v. *Gibson*, 302 Conn. 653, 658–59, 31 A.3d 346 (2011).

[6] See *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

[7] At trial, evidence was presented that "U-Visas" are visas that are available to victims of criminal activity and their qualifying family members.

[8] See *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

[9] Before asking the disputed question in *Juan V.*, the prosecutor asked the victim: "And the things that you told [the forensic interviewer], were they true?" (Internal quotation marks omitted.) *State* v. *Juan V.*, supra, 109 Conn. App. 439. The defendant objected, on the ground that the state was improperly attempting to bolster the victim's credibility, and the court agreed to strike the question and the victim's affirmative answer. Id. In dicta in *Juan V.*, we also observed that the disputed question of whether the victim understood that she was supposed to tell the truth during the interview was "readily distinguishable from the impermissible and previously stricken question of whether she was, in fact, telling the truth [during the interview]. The latter is an improper invasion of the province of the jury, as it seeks to bolster [the victim's] credibility before it has come under attack." Id., 441.

[10] It appears that the prosecutor asked these questions without objection from defense counsel. See *State* v. *Albino*, supra, 130 Conn. App. 774 n.6 (providing excerpts from the disputed examinations).

[11] Although we conducted a due process analysis of the prosecutorial

improprieties that occurred at trial, the focus of our due process analysis was on the impact of the prosecutor's repeated and improper use of the words, "victim," "murder," and "murder weapon" during the evidentiary phase of trial and throughout closing argument. *State* v. *Albino*, supra, 130 Conn. App. 759.

[12] Even if we were to conclude that the disputed questions rose to the level of prosecutorial impropriety, considering these improprieties within the framework of the entire trial, and after giving due consideration to the factors identified in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), we would still conclude that the defendant was not denied a fair trial, and, therefore, reversal of the defendant's convictions would be unwarranted.

[13] First, the defendant challenges the prosecutor's remark: "Remember what she's had to do. She's went through counseling. She's went through medical exams. She's went through interviews. She's went through court appearances. And she's gone through cross-examination. And after all that, I am arguing to you that this evidence shows she's not fabricating these things. Defense focused on all of the supposed reasons she's fabricating these claims except for one. There's one they left out. And [the victim] was asked about this, she was asked, [the victim], she was sort of asked, you know, why are you saying these things about your father. And here's what she said, I had to get out of the life I had with him. If you were in her position, would you feel the same way? This is exactly what a person would say that was in this position."

Second, the defendant challenges the prosecutor's argument: "You [have] seen how a young woman who makes up a claim of sexual assault kind of has to come through and run the legal gauntlet. Even the members of her family can testify against her."

[14] The defendant appears to argue that the prosecutor's reference to the victim making reports of sexual abuse to Jiminez and Dr. Ron-Priola were improper because it violated the court's constancy of accusation order. We first observe that the court never precluded the admission of constancy of accusation testimony; it merely ordered that such testimony had to be admitted in accordance with our rules on the admissibility of constancy evidence. In addition, the state never offered any constancy evidence. Nonetheless, to the extent that the defendant attempts to raise a separate claim of prosecutorial impropriety on the basis of the prosecutor's purported violation of an evidentiary ruling by the court, we conclude that such a claim is inadequately briefed. See *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016).

---