******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RICKY BUNN, JR.
(AC 42915)

Prescott, Moll and Eveleigh, Js.

*Syllabus*

Convicted, following a jury trial, of the crimes of murder, conspiracy to commit murder, and possession of a pistol without a permit, the defendant appealed. At trial, during cross-examination of the defendant, the prosecutor asked a question that referenced the defendant's consultation with his counsel. Defense counsel did not object but the trial court, sua sponte, issued a cautionary instruction to the jury. On appeal, the defendant claimed that the prosecutor's question constituted prosecutorial impropriety that deprived him of his due process right to a fair trial. *Held* that the defendant could not prevail on his claim that the prosecutor's question to the defendant, even if it was assumed to be an impropriety, deprived him of his due process right to a fair trial, as any impact of that alleged impropriety was sufficiently cured by the trial court's strong curative instruction; the state presented a strong case, the severity of the alleged impropriety was low, the alleged impropriety was limited to one question that was qualified in nature, and, although the alleged impropriety was not invited by defense counsel, and the alleged impropriety would have been central to the issues before the jury as it involved the defendant's testimony in a criminal trial, any impact the alleged impropriety had on the central issue of credibility was sufficiently cured by the trial court's strong curative instruction to the jury that was specifically directed at the question.

Argued December 2, 2019—officially released March 24, 2020

*Procedural History*

Information charging the defendant with the crimes of murder, conspiracy to commit murder, and carrying a pistol without a permit, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Vitale, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Gary A. Mastronardi*, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom were *John P. Doyle, Jr.*, senior assistant state's attorney, and, on the brief, *Patrick J. Griffin*, state's attorney, for the appellee (state).

*Opinion*

EVELEIGH, J. The defendant, Ricky Bunn, Jr., appeals from the judgment of conviction, rendered following a jury trial, of murder in violation of General Statutes § 53a-54a (a), conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a (a), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims that the prosecutor engaged in prosecutorial impropriety that deprived him of a fair trial. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In April, 2014, the defendant and the victim, Torrence Gamble, were both sixteen years old and members of Piru, a street gang affiliated with the Bloods, which had a local presence in New Haven. Piru had a hierarchical structure, and Jaquwan Burton was one of the Piru leaders in New Haven. At approximately 6:45 a.m. on April 3, 2014, the police arrested Jaquwan Burton, who had been staying at the home of his girlfriend, Laneice Jackson. Jackson called the defendant at 7:08 a.m. and continued to exchange phone calls with him throughout the day.

At approximately 4:40 p.m. that day, Jaquwan Burton called Jackson from the facility in which he was being held and, while on speaker phone, indicated that "somebody set [me] up." Jackson, Jackson's mother, and her boyfriend, Ricky Freeman, a member of a different sect of the Bloods who gave advice to young Piru members, all thought that the victim had informed the police of Jaquwan Burton's location.[1] Freeman stated that the victim "had to go," and Jaquwan Burton agreed with Freeman that the victim needed to be killed. Freeman instructed John Helwig to "get in contact" with Otis Burton,[2] who was a member of Piru, and the defendant because "they know what to do." Freeman also instructed Helwig to "[g]et up with them and . . . handle it." Helwig was closely associated with Piru but was not a member, and would drive Piru members to "stash houses" and to locations where Piru members would commit crimes.

Helwig contacted the defendant, who, in turn, contacted Otis Burton. When Helwig arrived at the defendant's house, Otis Burton and the defendant, who was dressed in black and carrying a gun, entered Helwig's truck. Helwig informed the defendant and Otis Burton that, according to Freeman, "[the victim] had to die and [the defendant] was supposed to do it." The defendant called Paul Hill, who stated that the victim was at Hill's house, and the defendant instructed Helwig to drive to that location.

Once at Hill's house, the defendant and Otis Burton exited the truck. The defendant and Otis Burton joined the group inside Hill's house, and, after the group dis-

persed, the victim, the defendant, and Otis Burton walked to a nearby store. While on Daggett Street on the return route from the store, the defendant lagged behind, stating that he needed to tie his shoe, and fired one fatal shot to the back of the victim's head. Helwig received an urgent call from the defendant telling him to "come quick" to retrieve him and Otis Burton. After entering Helwig's truck, the defendant told Helwig to "go, go, go, go." The defendant was crying and Otis Burton was "choked up." The defendant was holding a nine millimeter handgun that smelled of gun smoke, which, at Helwig's instruction, he placed in a compartment in the back seat of the truck. The defendant admitted to Helwig that he had shot the victim in the back of the head.

Sometime after Helwig drove him home, Otis Burton texted the defendant, questioning if the victim had survived and if he would accuse them, to which text message the defendant responded, "chill, we got it." The defendant and Helwig visited Freeman, and the defendant explained to them how he and Otis Burton lured the victim from Hill's house and how he shot the victim in the back of the head after lagging behind while pretending to tie his shoe.

When the police interviewed the defendant in August, 2014, he stated that, at the time of the incident, he was with Miquel "Quel" Lewis in the Newhallville area of New Haven. According to phone records, the defendant's cell phone connected to cell towers located near the defendant's home around 9 p.m., to cell towers in the Hill neighborhood where the murder occurred from 9:30 to 9:43 p.m., and to cell towers in the Newhallville area of New Haven from 9:50 to 9:52 p.m. The defendant, Otis Burton, and Helwig were arrested in connection with the murder.

While in prison, the defendant wrote a letter "to the love of my life," stating that "you need to tell Quel this. I got a buried blick in my backyard behind my old crib near the garage. . . . I never told anyone in the world w[h]ere it was or I had it. Tell him he needs to go and get it and don't lose my shit." The police understood the word "blick" to be a street term for a firearm and "Quel" to refer to Lewis.

Prior to the start of evidence, the state moved for a sequestration order of potential witnesses, and the court granted the motion. Helwig and Otis Burton both pleaded guilty to conspiracy to commit murder and testified for the state pursuant to their respective plea agreements. The defendant was the only witness to testify for the defense, and he testified on direct examination to the following version of events. Piru had a positive impact on him by making sure that he stayed in school and did well in sports. On the morning of April 3, 2014, he received a phone call from Jackson, who informed him that Jaquwan Burton had been

arrested. That evening, while he was in Helwig's truck with Otis Burton, Helwig mentioned that he thought the victim had informed the police of Jaquwan Burton's location and that "we got to make sure something gets done," but he did not indicate that anything should be done that night. The defendant was "very close" with the victim, with whom he shared a bond due to having been initiated into Piru together. He learned from social media that there was a gathering at Hill's house where everyone was together "smoking . . . [c]hilling . . . whatever," and he called Hill regarding the gathering. He suggested that Helwig drive to Hill's house so that he and Otis Burton could attend. After spending some time at Hill's house smoking marijuana, he, Otis Burton, and the victim left. Otis Burton and the victim went to a nearby store while he urinated behind Hill's house. While on his way to meet up with the victim and Otis Burton, the defendant heard a gunshot and saw someone running from Daggett Street. He began running and saw Otis Burton, who instructed him to call Helwig. While in Helwig's truck, Otis Burton gave Helwig a gun and stated that he had shot the victim.

During cross-examination of the defendant, the following colloquy occurred:

"[The Prosecutor]: So, good afternoon . . . . So, . . . you had the benefit of over the last four days of sitting here throughout this entire trial, isn't that correct?

"[The Defendant]: Yes.

"[The Prosecutor]: And you heard the testimony of everybody that came before you, isn't that correct?

"[The Defendant]: Yes.

"[The Prosecutor]: Including . . . Helwig and [Otis] Burton, correct?

"[The Defendant]: Yes. Yes.

* * *

"[The Prosecutor]: And again—Now, by the way, you were able to sit here and listen to all the testimony that was presented here in this courtroom, right?

"[The Defendant]: You're right.

"[The Prosecutor]: And over there, I'm sure you got a folder and a binder, and you've seen all the reports and all the statements and everything that the New Haven Police Department and the FBI has done and everybody has done in this case, and you've been reading them and you've been analyzing them, isn't that correct?

"[The Defendant]: Yeah. I read them. Yeah. Yeah, I read them.

"[The Prosecutor]: You've—you've been reading them, is that correct . . . ?

"[The Defendant]: Yeah. That's correct. Yeah.

"[The Prosecutor]: And without getting into conversations with your lawyer but you—about—you talked to your lawyers about what's in those statements and those reports, right?

"[The Defendant]: Yeah.

"[The Prosecutor]: So, walking in here, okay, you know everything that's in the documents or the reports prior to hearing the testimony here today?

"[The Defendant]: Uh-huh.

"[The Prosecutor]: Okay. But you, sir, are the only one that got to hear everybody's testimony, isn't that correct?

"[The Defendant]: You're right."

The defendant was the last witness to testify before the close of evidence. The following morning, the court stated on the record that an in-chambers discussion with counsel had occurred regarding the court's proposed jury instructions. The court stated that it would provide the jury with a cautionary instruction. The court inquired of defense counsel, "before we get to the cautionary instruction . . . did you wish to be heard at all? Any objections with respect to the court's proposed instructions?" Defense counsel responded: "No, Your Honor." The court then explained the instruction[3] and asked defense counsel: "[D]id you wish to be heard at all?" Defense counsel answered: "No, Your Honor. I'm in . . . agreement with the court."

During closing argument, the state mentioned the defendant's opportunity to tailor his testimony and did not mention the defendant's consultation with counsel. During its instructions to the jury, the court gave the following cautionary instruction: "Now, ladies and gentlemen, I'm going to provide you with a specific instruction to address an improper question that was asked by the state during its cross-examination of the defendant. I am speaking specifically about a question by the state that generally referenced whether the defendant had consulted with his attorneys when reviewing the police reports and statements connected with this case. I am instructing you specifically that the specific question asked by the state in this regard was improper, and you are to completely disregard it. The question and answer are stricken from the record and may play no role in your deliberations in this case. I want you to be clear that every defendant has a constitutional right to the assistance of counsel, which necessarily means the ability to consult with his attorney. I am therefore instructing you that you may draw no negative or unfavorable inferences from the defendant's exercise of his constitutional right to consult with his counsel when reviewing documents connected to this case. As I have told you repeatedly, the defendant is presumed

innocent, and the burden of proof rests entirely with the state to prove the defendant's guilt beyond a reasonable doubt." After completing the jury instructions and outside the presence of the jury, the court asked defense counsel if he wanted to be heard, to which defense counsel responded: "No, Your Honor. I have no exceptions."

The defendant was convicted of murder, conspiracy to commit murder, and carrying a pistol without a permit, and was sentenced to forty-seven years of incarceration. This appeal followed.

The defendant claims that the prosecutor engaged in prosecutorial impropriety by asking him during cross-examination the following question regarding the police and FBI documents: "And without getting into conversations with your lawyer but you—about—you talked to your lawyers about what's in those statements and those reports, right?" The defendant argues that, by asking this question, the prosecutor implied that he contrived his testimony on direct examination using knowledge that he had acquired from two sources: his presence in court during trial; and from the police and FBI documents. He contends that because the prosecutor linked the defendant's consultation with counsel to the latter of the two sources, the prosecutor implied that he had tailored his direct examination testimony with the assistance of counsel. He argues that this impropriety deprived him of his due process right to a fair trial.[4] We disagree.

We review the defendant's unpreserved claim of prosecutorial impropriety under a two step analytical process. "We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[T]he touchstone of due process analysis in cases of alleged [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions] in the context of the entire trial. . . .

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . [A] determination of whether the defendant was deprived of his right to a fair trial . . . must involve the application of the factors set out . . . in

*State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). As [the court] stated in that case: In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"Regardless of whether the defendant has objected to an incident of [impropriety], a reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the [impropriety] is viewed in light of the entire trial. . . . The application of the *Williams* factors, therefore, is identical to the third and fourth prongs of [*State* v.] *Golding*, [213 Conn. 233, 239–40, 567 A.2d 823 (1989)] namely, whether the constitutional violation exists, and whether it was harmful. . . . Requiring the application of both *Williams* and *Golding*, therefore, would lead . . . to confusion and duplication of effort. . . . Application of the *Williams* factors provides [the appropriate] analysis, and the specific *Golding* test, therefore, is superfluous." (Citations omitted; internal quotations marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 32–34, 917 A.2d 978 (2007).

It is not improper for a prosecutor to comment on a defendant's opportunity to fabricate or to tailor his testimony as a result of the defendant's presence in the courtroom and his ability to hear the testimony of other witnesses. See *State* v. *Alexander*, 254 Conn. 290, 294–300, 755 A.2d 868 (2000). "Defense counsel are not immunized from being spoken about during criminal trials. . . . If reference to a defendant's decision to consult with counsel is focused and pertinent to a proper issue, rather than part of an invitation to infer guilt, it is not improper. . . . [P]rosecutors tread on extremely thin ice when they comment on a defendant's decision to consult with counsel . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Santiago*, 100 Conn. App. 236, 247, 917 A.2d 1051, cert. denied, 284 Conn. 933, 935 A.2d 153 (2007).

Turning to the present case, even if we assume, without deciding, that the prosecutor's question that referenced the defendant's consultation with counsel was improper, we are unconvinced that the defendant was denied a fair trial. Applying the first *Williams* factor, we conclude that the prosecutor's impropriety was not invited by defense conduct or argument. No question raised by defense counsel on direct examination invited the prosecution to mention his consultation with

counsel.

We next examine the second *Williams* factor regarding the severity of the impropriety. In determining whether the prosecutorial impropriety was severe, "it [is] highly significant that defense counsel failed to object to . . . the improper [remark], [to] request curative instructions, or [to] move for a mistrial. . . . A failure to object demonstrates that defense counsel presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Fauci*, supra, 282 Conn. 51. In the present case, the defendant did not object to the prosecutor's question, request a curative instruction, or move for a mistrial. Furthermore, the prosecutor's question did not directly ask the jury to infer guilt from the defendant's consultation with counsel. We conclude that the severity was low.

Next, we examine the third *Williams* factor regarding the frequency of the alleged impropriety. The alleged impropriety was isolated to one question that was qualified in nature, specifying that the prosecutor was not inquiring into conversations with counsel, and was ambiguous as to its meaning. We disagree with the defendant that the alleged impropriety "echoed throughout" all of the prosecutor's proper questions that attacked the defendant's credibility on the ground that he tailored his testimony after having listened to the evidence presented at trial. It is not reasonable to assume that the jury, after hearing the prosecutor's single question pertaining to the defendant's pretrial review of certain documentary evidence with the assistance of counsel, inferred from the defendant's consultation with his counsel that he had tailored his testimony according to the testimony he had heard at his trial. Therefore, we conclude that the allegedly improper comment was infrequent and that this *Williams* factor weighs heavily in the state's favor.

The fourth *Williams* factor is the centrality of the impropriety to the critical issues before the jury. The defendant's argument that the one question at issue called into question the entirety of his version of events by suggesting that it was tailored with the assistance of counsel attributes a larger impact than the narrow focus of the question, which concerned the defendant's review of New Haven Police Department documents with the assistance of counsel. Assuming that one question implicated the defendant's credibility as to his version of events, that issue was not central to the critical issues in the case. We note that the case did not involve a credibility contest between two witnesses. See, e.g., *State* v. *A. M.*, 324 Conn. 190, 211–12, 152 A.3d 49 (2016) (determining that credibility was central issue that was critical in sexual assault case in which physical evidence was lacking and there were no corroborating

witnesses). Although Otis Burton and the defendant were the only two witnesses present at the scene of the murder, Helwig's testimony that he drove the defendant and Otis Burton to Hill's house, that the defendant called Helwig to retrieve him and Otis Burton following the murder, that the defendant was crying and holding a recently discharged firearm when he returned to Helwig's truck following the murder, and that the defendant stated to Helwig that he had shot the victim, corroborated Otis Burton's testimony. Helwig's and Otis Burton's testimony was also corroborated by phone records showing that the defendant had called Helwig around the time of the murder and that the defendant's cell phone connected to cell towers within the vicinity of the murder. Nevertheless, because the defendant's testimony in a criminal trial is often central to the outcome of the case, we conclude that this factor, in the absence of a strong curative instruction, would weigh in favor of the defendant.

The fifth *Williams* factor, the strength of the curative measures adopted, strongly weighs in favor of the state. "[A] prompt cautionary instruction to the jury regarding improper prosecutorial remarks or questions can obviate any possible harm to the defendant. . . . Moreover, [i]n the absence of an indication to the contrary, the jury is presumed to have followed [the trial court's] curative instructions. . . . [A] general instruction does not have the same curative effect as a charge directed at a specific impropriety, particularly when the misconduct has been more than an isolated occurrence." (Citations omitted; internal quotation marks omitted.) *State v. Ceballos*, 266 Conn. 364, 413, 832 A.2d 14 (2003). In the present case, despite the fact that defense counsel did not object to the prosecutor's question, the court, sua sponte, gave a curative instruction. The defendant was the final witness to testify, and the court gave the curative instruction the following day. The curative instruction was specifically directed to the prosecutor's question that underlies the defendant's appeal; the court directed the jury to disregard the question and answer and instructed the jury regarding a defendant's right to consult with counsel. When asked by the court if he wished to be heard regarding the cautionary instruction, defense counsel stated that he agreed with the instruction. The trial court's specific instruction that was directed at the prosecutor's question was sufficient to cure any impropriety.

The defendant contends that the prosecutor's question at issue casts doubt on the entirety of the defendant's testimony on direct examination regarding his version of the events. He argues therefore, that, the curative instruction was insufficient and that the court, instead, should have stricken all of the prosecutor's cross-examination of the defendant that pertained to the defendant's having tailored his testimony. Even if such taint had occurred, the court's narrowly tailored

curative instruction that the jury should draw no negative inferences from the defendant's exercise of his right to consult with counsel, was sufficient to cure it. Given the court's thorough instruction, which the jury is presumed to have followed, there is no reasonable possibility that the jury based its verdict on the fact that the defendant had consulted with counsel and tailored his testimony in line with the documents according to the advice of counsel.

We turn now to the final *Williams* factor, concerning the strength of the state's case. Our Supreme Court has "never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial [impropriety] did not deprive the defendant of a fair trial." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 596, 849 A.2d 626 (2004). In any event, the evidence in the present case was strong. There was evidence that Freeman told Helwig to contact Otis Burton and the defendant and to have them "handle" the situation. Otis Burton testified that the defendant shot the victim in the back of the head. The defendant entered Helwig's truck holding a gun. Around the time of the murder, the defendant telephoned Helwig to retrieve him and Otis Burton, and the defendant, after entering Helwig's truck with a gun that smelled of gun smoke, was crying and instructed Helwig to "go, go, go, go." The defendant explained to Helwig and Freeman how he gave the excuse that he needed to tie his shoe and then shot the victim in the back of the head. Additionally, in response to Otis Burton's text message questioning whether the victim had survived and would accuse them, the defendant responded, "chill, we got it." The defendant's phone records showed that he placed a cell phone call to Helwig at 9:43 p.m. while he was in the vicinity of the murder scene. The police did not recover the murder weapon, and the defendant wrote a letter stating that he had buried a gun in his backyard and requested its removal. The testimony of the other witnesses coupled with the defendant's confession presented a strong case on behalf of the prosecution.

Therefore, we conclude that the *Williams* factors weigh in favor of the state. Any impact the alleged impropriety had on the central issue of credibility was sufficiently cured by the excellent curative instruction given by the trial court. The defendant, therefore, was not deprived of his due process right to a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The information that the police received that led to Jaquwan Burton's arrest did not, in fact, come from the victim.

[2] Jaquwan Burton and Otis Burton are not related.

[3] The court stated: "Okay. Regarding the cautionary instruction the court intends to deliver, the court is informed by *State* v. *Santiago*, [100 Conn. App. 236, 917 A.2d 1051, cert. denied, 284 Conn. 933, 935 A.2d 153 (2007)]. . . . Although factually the situation presented here is some[what] different,

the state during its cross-examination of the defendant yesterday did question the defendant several times about the fact, essentially, that his presence in the courtroom provided him with the opportunity to tailor his testimony, along the lines of the argument. That is permitted in such cases as *State* v. *Adeyemi*, [122 Conn. App. 1, 998 A.2d 211, cert. denied, 298 Conn. 914, 4 A.3d 833 (2010)]. The court's concern is that the single follow-up question, which incorporated the defendant's review essentially of discovery material with his attorney, may be misconstrued by the jury as somehow being probative of the defendant's guilt. However, I want to be clear that I do not believe it was the state's intention to do so by that question. It was an isolated inquiry among a series of questions on that general topic that mentioned the involvement of counsel, and I don't think that the question itself undeniably or openly hinted to the jury that the fact that the defendant consulted with counsel was probative of his guilt. In fact, the court views the absence of an objection to the question by the defendant as a tacit understanding that it was not the state's intention to do so, and [defense counsel] has not made that claim. However, to avoid even the remote possibility that the isolated question could be viewed in an impermissible manner by the jury, the court intends to instruct the jury to disregard that specific question and answer, and that they are to draw no negative or unfavorable inference from the defendant's exercise of his constitutional right to counsel. And the state obviously is not going to mention that in its closing argument."

[4] The defendant does not argue on appeal that the alleged impropriety infringed on a specifically enumerated constitutional right. See, e.g., *State* v. *Payne*, 303 Conn. 538, 565, 34 A.3d 370 (2012). Accordingly, the burden is on the defendant to establish that the alleged impropriety deprived him of his due process right to a fair trial. Id.